[No. H036273. Sixth Dist. July 17, 2012.]

PAUL GOLDSTONE, as Trustee, etc., Plaintiff and Appellant, v.
COUNTY OF SANTA CRUZ, Defendant and Respondent;
ALIMUR PARK HOMEOWNERS ASSOCIATION, Intervener and
Respondent.

COUNSEL

Gilchrist & Rutter, Thomas W. Casparian, Richard H. Close and Yen N. Hope for Plaintiff and Appellant.

Dana McRae, County Counsel, and Jason M. Heath, Assistant County Counsel, for Defendant and Respondent.

Law Office of William J. Constantine and William J. Constantine for The Bay Federal Credit Union as Amicus Curiae on behalf of Defendant and Respondent.

Aleshire & Wynder, William W. Wynder, Sunny K. Soltani and Jeff M. Malawy for City of Carson and City of Chino as Amici Curiae on behalf of Defendant and Respondent.

Senior Citizens Legal Services, Terrence Lee Hancock and Mary Thuerwachter for Intervener and Respondent.

OPINION

**PREMO, J.**—Appellant Paul Goldstone, as trustee of the Trust U.T.D. June 27, 2003 (Goldstone), appeals from a judgment entered on his petition for writ of administrative mandamus, which sought to overturn the decision of the Santa Cruz County Board of Supervisors denying an application to convert the Alimur Mobilehome Park (Alimur) from rental to condominium ownership. That petition was opposed in the trial court by respondent County of Santa Cruz (County) and intervener Alimur Park Homeowners Association (HOA).

On appeal, Goldstone contends that County exceeded its authority under Government Code section 66427.5[1] by relying on the near-unanimous opposition of the mobilehome park residents, as reflected in a survey of resident support, as the reason for denying the conversion application. According to Goldstone, section 66427.5, subdivision (e) requires that the scope of a conversion application hearing is limited to determining whether or not the applicant complied with section 66427.5's requirements.

We disagree and shall affirm the judgment. Under section 66427.5, subdivision (d)(5), County was authorized to take the results of the resident survey into account when making its decision.

---

[1] Further unspecified statutory references are to the Government Code.

## I. *Factual and Procedural Background*[2]

Goldstone is the owner of Alimur, a 147-space mobilehome park located in an unincorporated portion of County. Alimur has operated as a rental park for many years, meaning residents owned their respective mobilehomes but leased the space on which their mobilehome sat. On June 19, 2007, Goldstone applied for a permit to convert Alimur to resident ownership.

Goldstone entered into an agreement with HOA over the content of a survey form (resident survey) to be provided to Alimur residents. The resident survey advised the residents of the proposed conversion to resident ownership and requested they complete the survey to indicate whether or not they supported the conversion. Residents were directed to contact representatives from both HOA and Goldstone if they had questions about "their views on the conversion and its impact on [the resident]."

In June 2008, Goldstone prepared and distributed to the residents a tenant impact report (TIR) which provided information on the proposed conversion and explained "the protections afforded to those Resident Households that elect not to purchase a condominium interest in the Park." According to the TIR, "[b]ased upon a demographic survey of all Resident Households taken during September 2007, it is estimated that 84% (eighty-four percent) of the current residents are low income; 48% (forty-eight percent) are seniors (62 years of age or older); and 11% (eleven percent) are disabled [citation]."

The resident survey was distributed on August 20, 2008. One hundred twenty-one residents returned completed ballots, with two supporting the conversion and 119 opposing it.[3]

On October 7, 2008, Goldstone sent a letter to HOA claiming that residents had complained "of overt intimidation, misinformation and scare tactics by certain members of the HOA Board in pressuring them to vote against the conversion. It was reported the HOA representatives preyed on the elderly and most vulnerable residents, telling them that they were going to lose their homes and be forced to move if they did not vote against the conversion. Others reported that the HOA went door-to-door, refusing to leave until residents marked the survey against the conversion. Residents have reported that the intimidation used was relentless, and so frightening that they are not even willing to let their names be used for fear of retribution."

---

[2] In the course of briefing the case, Goldstone submitted two and HOA submitted one request for judicial notice, all of which sought to have this court take judicial notice of certain documents related to the legislative history of section 66427.5. We granted all of those requests.

[3] Two residents returned the survey without indicating if they supported or approved the conversion.

HOA responded to Goldstone on October 11, 2008, expressing disbelief that anyone at Alimur was intimidated or harassed by any other resident, let alone a member of HOA's Board. HOA urged the supposedly intimidated residents to come forward so that their complaints could be investigated.

The staff report, prepared for the scheduled February 25, 2009 hearing on Goldstone's conversion application, recommended that the Santa Cruz County Planning Commission vote to recommend that the Santa Cruz County Board of Supervisors (Board) deny the application. According to the staff report, the proposed conversion was "presumed to not be a bona-fide resident conversion" as defined by former Santa Cruz County Code section 14.08.070[4] because the resident survey showed the conversion was supported by less than 50 percent of residents.

On February 23, 2009, Goldstone wrote a letter to the members of the planning commission in support of the application. In that letter, Goldstone again claimed that residents were "subject[ed] to a campaign of misinformation and harassment by the Park's HOA." Attached to the letter was a signed statement from one Alimur resident, Cynthia Bunch, who described how she was pressured to vote against the conversion by an HOA member. The letter also advised that, if the application were approved, Goldstone would provide incentives to promote unit purchases by the residents including a 15 percent discount off the appraised fair market value of the unit and 20 percent owner financing at below market rates, and would commit to extending statutory rent control protections to moderate-income residents as well as low-income residents.

At the February 25, 2009 planning commission hearing, residents submitted approximately 50 letters explaining why they opposed the conversion. The planning commission voted unanimously to recommend that the Board deny the conversion application.

On April 21, 2009, the Board held a public hearing to consider Goldstone's application. No Alimur residents testified in support of the application, though several testified in opposition. Many residents submitted written statements opposing the conversion. The Board voted unanimously to deny the application on the grounds that the proposed conversion was presumptively not a bona fide resident conversion in accordance with Santa Cruz County Code section 14.08.070 based on the fact that less than 50 percent of the residents surveyed supported the conversion.

In July 2009, Goldstone filed a petition for writ of administrative mandate in the Santa Cruz County Superior Court. HOA was granted leave to intervene in the writ proceedings.

---

[4] This county ordinance was repealed on September 29, 2009.

On September 15, 2009, the Board rescinded its denial of Goldstone's application and remanded the matter to the planning commission for reconsideration under section 66427.5. At the same meeting, the Board initiated the repeal of chapter 14.08 of the Santa Cruz County Code. The impetus for both of these actions was the publication of *Sequoia Park Associates v. County of Sonoma* (2009) 176 Cal.App.4th 1270 [98 Cal.Rptr.3d 669] (*Sequoia Park*), which invalidated a similar Sonoma County mobilehome conversion ordinance.

On December 30, 2009, the trial court denied Goldstone's writ petition without prejudice, pending the Board's taking further action on the conversion application. The court also found that, contrary to Goldstone's position, section 66427.5, subdivision (d)(5), "is clear and unambiguous on its face, and states that the *results* of the required resident survey *shall be considered* by the local agency reviewing the application as part of the subdivision map hearing required by . . . section 66427.5[,] [subdivision] (e). Based on this plain and clear language, the Court finds that a local agency considering a subdivision application under . . . section 66427.5 is required to consider (i.e., take into account, deliberate on, weigh, etc.) the results of the resident survey in determining whether to approve, conditionally approve, or deny the application."

Goldstone and HOA stipulated that the administrative record from the prior planning commission and Board hearings would remain part of the official administrative record and other evidence and testimony offered at the rehearings would supplement that record. The parties also agreed that the "amount and nature of the in-person testimony by any Park Residents shall not be used to argue to the County Agencies or to the court that there has been any significant change in the level of Resident support for the conversion . . . as existed at the [prior] [h]earings."

At the December 9, 2009 planning commission hearing, a number of residents submitted additional letters opposing the conversion application. The planning commission again unanimously recommended that the Board deny the conversion application, on the grounds that the resident survey demonstrated near unanimous opposition by residents to the conversion and County must consider the results of the resident survey when reviewing a mobilehome conversion application pursuant to section 66427.5.

On January 26, 2010, the Board conducted a second hearing on Goldstone's conversion application. The Board again unanimously denied the application. The Board determined the following: (1) it was required by section 66427.5, subdivision (d)(5) to "consider the results of the resident survey of support

when exercising its discretion to approve, conditionally approve or disapprove a proposed mobilehome park conversion project"; (2) the state Legislature intended to grant local agencies "the authority to deny conversions that lacked the support of park residents and ensure that a conversion pursuant to Section 66427.5 is a bona fide conversion"; and (3) "[t]he results of the survey, testimony and other evidence submitted by park residents establishes [*sic*] near unanimous opposition" to the conversion.

On May 25, 2010, Goldstone filed a supplemental petition for writ of administrative mandamus seeking to reverse the Board's January 26, 2010 denial of the conversion application. The trial court denied the petition on November 2, 2010. In its order, the trial court found that the Board "properly exercised its discretion when it considered the results of the resident survey. The stated intent of the Legislature in adding the survey requirement was to grant local agencies the authority to deny conversions that lacked the support of park residents in order to ensure that a conversion pursuant to section 66427.5 is a bona fide resident conversion." The trial court entered judgment against Goldstone.

Goldstone timely appealed.

## II. *Discussion*[5]

The sole issue presented for our review is how to interpret section 66427.5, specifically the seemingly conflicting directives laid out in subdivisions (d)(5) and (e). Subdivision (d)(5) requires the conversion applicant to submit "the results" of a survey of resident support to the local agency "to be considered as part of the subdivision map hearing prescribed by subdivision (e)."[6] Subdivision (e) provides, in relevant part, that the "scope of the [subdivision map] hearing shall be limited to the issue of compliance with this section."

Goldstone argues County exceeded its authority by relying on a lack of resident support to deny the conversion application. According to Goldstone, section 66427.5, subdivision (e) expressly limits a local agency's scope of review to whether or not the applicant complied with the statutory require-ments. Goldstone conducted the resident survey in the manner required by the statute and submitted it to County as part of the hearing; thus, County

---

[5] We have received and considered two amicus curiae briefs in support of County and HOA. One brief is filed by Bay Federal Credit Union and the other by the cities of Carson and Chino. We appreciate the cogent analyses presented and have addressed the principal arguments raised in those briefs within the discussion that follows.

[6] Other section 66427.5, subdivision (d) subsections specify the means by which the survey must be conducted. The survey must be conducted in accordance with an agreement between the subdivider and any resident homeowners association (subd. (d)(2)); it must be obtained by written ballot (subd. (d)(3)); and each occupied mobilehome space is afforded one vote (subd. (d)(4)).

exceeded its authority by citing the lack of resident support as the basis for denying Goldstone's application. Furthermore, Goldstone contends a "bona fide conversion" is not one which garners the support of a majority of residents, but is one where the park owner "intends to and does offer the newly subdivided units in good faith to the residents for purchase."

County, HOA and amici curiae contend that the language of section 66427.5 expressly requires local agencies to "consider" the "results of the survey" when determining whether or not to approve a mobilehome conversion application. (§ 66427.5, subd. (d).) If a local agency is limited to simply determining whether or not the applicant complied with the statute's requirements, the language of subdivision (d) is reduced to surplusage. Further, Goldstone's definition of what constitutes a bona fide conversion is not supported by case law or the legislative history of the statute.

### A. Standard of review

■  The dispute involves a question of statutory interpretation subject to our de novo review. (*California Teachers Assn. v. San Diego Community College Dist.* (1981) 28 Cal.3d 692, 699 [170 Cal.Rptr. 817, 621 P.2d 856].) That review is guided by settled rules, all of which are geared to ascertaining the intent of the lawmakers and avoiding an interpretation that would lead to absurd consequences. (*Cypress Semiconductor Corp. v. Superior Court* (2008) 163 Cal.App.4th 575, 581 [77 Cal.Rptr.3d 685].) We begin with the statutory language, giving the words their usual and ordinary meaning. (*Day v. City of Fontana* (2001) 25 Cal.4th 268, 272 [105 Cal.Rptr.2d 457, 19 P.3d 1196].) "If [the statutory language] is clear and unambiguous our inquiry ends. There is no need for judicial construction and a court may not indulge in it." (*Diamond Multimedia Systems, Inc. v. Superior Court* (1999) 19 Cal.4th 1036, 1047 [80 Cal.Rptr.2d 828, 968 P.2d 539].)

■  We must also "if possible, . . . give effect and significance to every word and phrase of a statute." (*Garcia v. McCutchen* (1997) 16 Cal.4th 469, 476 [66 Cal.Rptr.2d 319, 940 P.2d 906].) When two provisions touch upon a common subject, "we must construe them 'in reference to each other, so as to "harmonize the two in such a way that no part of either becomes surplusage." ' " (*Ibid.,* quoting *DeVita v. County of Napa* (1995) 9 Cal.4th 763, 778–779 [38 Cal.Rptr.2d 699, 889 P.2d 1019].) "We must presume that the Legislature intended 'every word, phrase and provision . . . in a statute . . . to have meaning and to perform a useful function.' " (*Garcia v. McCutchen, supra,* at p. 476, quoting *Clements v. T. R. Bechtel Co.* (1954) 43 Cal.2d 227, 233 [273 P.2d 5].) When the language of a provision is ambiguous and susceptible of more than one reasonable meaning, we may turn to extrinsic aids such as the legislative history of the measure. (*Diamond Multimedia*

*Systems, Inc. v. Superior Court, supra,* 19 Cal.4th at p. 1055.) ▮ In addition, " '[w]hen the Legislature amends a statute without altering portions of the provision that have previously been judicially construed, the Legislature is presumed to have been aware of and to have acquiesced in the previous judicial construction. Accordingly, reenacted portions of the statute are given the same construction they received before the amendment.' " (*Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1156 [278 Cal.Rptr. 614, 805 P.2d 873].)

Before we analyze the current version of section 66427.5, a brief review of the statute's history and its interpretation by various courts over the years will be instructive.

### B. Section 66427.5

#### 1. The 1991 enactment

When section 66427.5 was originally enacted in 1991, it applied only when a subdivider filed "a tentative or parcel map for a subdivision to be created using financing or funds provided pursuant to Chapter 11 (commencing with Section 50780) of Part 2 of Division 31 of the Health and Safety Code."[7] (Former § 66427.5.)[8] In an effort to "avoid the economic displacement of all nonpurchasing residents," statutorily defined low-income residents who decided not to purchase were protected by section 66427.5's mandated rent control as long as they resided at the park, and non-low-income residents who decided not to purchase were protected by a phased out limitation on raising rents to market level.[9] (Stats. 1991, ch. 745, § 2, p. 3324.)

#### 2. The 1995 amendments

In 1995, the Legislature amended both sections 66427.4 and 66427.5. The amendment to section 66427.4 limited its scope, providing in relevant part:

---

[7] Health and Safety Code section 50780, enacted in 1984, states that "it is the intent of the Legislature, in enacting this chapter, to encourage and facilitate the conversion of mobilehome parks to resident ownership or ownership by qualified nonprofit housing sponsors or by local public entities . . . ." (Health & Saf. Code, § 50780, subd. (b).)

[8] Conversions that did not require public financing under Health and Safety Code section 50780 were governed by section 66427.4. Subdivision (c) of this section permitted the responsible local entity or agency to "require the subdivider to take steps to mitigate any adverse impact of the conversion on the ability of displaced mobilehome park residents to find adequate space in a mobilehome park." (Stats. 1991, ch. 745, § 1, pp. 3323–3324.) Subdivision (d) of section 66427.4 made clear that its provisions "establishe[d] a minimum standard for local regulation of conversions of mobilehome parks into other uses" and did not "prevent a local agency from enacting more stringent measures." (Stats. 1991, ch. 745, § 1, p. 3324.)

[9] These provisions remain in the current statute. (See § 66427.5, subd. (f)(1) & (2).)

"This section shall not be applicable to a subdivision which is created from the conversion of a rental mobilehome park to resident ownership." (Stats. 1995, ch. 256, § 4, pp. 882, 883.)

The 1995 amendment to section 66427.5 widened its scope by deleting the former version's reference to "a subdivision to be created using financing or funds provided pursuant to [the Health and Safety Code]." (Stats. 1995, ch. 256, § 5, p. 883.) Henceforth, the section applied generally to "a subdivision to be created from the conversion of a rental mobilehome park to resident ownership." (Stats. 1995, ch. 256, § 5, p. 883.) The section's limitations on postconversion rent increases remained unchanged, and thus continued to provide greater protection to low-income residents than to non-low-income residents. The Legislature also added provisions intended to "avoid the economic displacement" of nonpurchasing residents by requiring subdividers to (1) offer all residents the option to purchase their units or to continue residency as a tenant, and (2) prepare a report on the impact of the conversion which was to be filed with the subdivision application and copies made available to each resident. (Stats. 1995, ch. 256, § 5, p. 883.) Finally, the Legislature added what was then section 66427.5, subdivision (d) which provided: "The subdivider shall be subject to a hearing by a legislative body or advisory agency, which is authorized by local ordinance to approve, conditionally approve, or disapprove the map. The scope of the hearing shall be limited to the issue of compliance with this section." (Stats. 1995, ch. 256, § 5, p. 883.)

### 3. The El Dorado decision

In *El Dorado Palm Springs, Ltd. v. City of Palm Springs* (2002) 96 Cal.App.4th 1153 [118 Cal.Rptr.2d 15] (*El Dorado*), the City of Palm Springs (City) approved a mobilehome park owner's application to convert the park from rental to resident owned, subject to the following three conditions: "(1) the use of a 'Map Act Rent Date,' defined as the date of the close of escrow of not less than 120 lots; (2) the use of a sale price established by a specified appraisal firm, the appraisal costs to be paid by [the owner]; and (3) financial assistance to all residents in the park to facilitate their purchase of the lots underlying their mobilehomes." (*Id.* at p. 1157.) On appeal, the court rejected City's argument that these conditions were authorized by section 66427.4, subdivision (c), which expressly allowed local authorities to require a subdivider to mitigate the impact of the conversion on displaced residents, on the grounds that section 66427.4 applies only when a mobilehome park is converted to uses other than as a mobilehome park. (*El Dorado, supra*, at pp. 1158, 1161–1162.)

The court also found that City's authority was circumscribed by the language of section 66427.5, former subdivision (d). Pursuant to that subdivision, "the City Council, in acting on [the owner's] application for approval of the tentative subdivision map, only had the power to determine if [the owner] had complied with the requirements of [section 66427.5]." (*El Dorado, supra,* 96 Cal.App.4th at pp. 1163–1164.) While the court was sympathetic to concerns that owners might circumvent local rent control provisions by obtaining approval to convert a mobilehome park to resident ownership, City had no authority under the statute to "impose additional conditions to prevent sham or fraudulent transactions at the time it approves the tentative or parcel map." (*Id.* at p. 1165.) While "it might be desirable for the Legislature to broaden the City's authority, it has not done so." (*Ibid.*)

### 4. *The 2002 amendments in response to* El Dorado

The same year that *El Dorado* was decided, the Legislature enacted the current version of section 66427.5. The Legislature added a new subdivision (d), which provides: "(1) The subdivider shall obtain a survey of support of residents of the mobilehome park for the proposed conversion. [¶] (2) The survey of support shall be conducted in accordance with an agreement between the subdivider and a resident homeowners' association, if any, that is independent of the subdivider or mobilehome park owner. [¶] (3) The survey shall be obtained pursuant to a written ballot. [¶] (4) The survey shall be conducted so that each occupied mobilehome space has one vote. [¶] (5) The results of the survey shall be submitted to the local agency upon the filing of the tentative or parcel map, to be considered as part of the subdivision map hearing prescribed by subdivision (e)." The first two sentences of former subdivision (d), which limited the scope of the hearing on a conversion application "to the issue of compliance with [section 66427.5]," were relabeled as subdivision (e). (§ 66427.5, subd. (e).)[10]

During the amendment process, the Legislature considered and rejected a proposal that would have changed the language of section 66427.5, former subdivision (d) (now subd. (e)) to provide: "The subdivider shall be subject to a hearing by a legislative body or advisory agency, which is authorized by local ordinance to approve, conditionally approve, or disapprove the map. The scope of the hearing shall be limited to the issue of compliance with this section *and any additional conditions of approval that the local legislative body or advisory agency determines are necessary to preserve affordability or to protect nonpurchasing residents from economic displacement.*" (Sen. Amends. to Assem. Bill No. 930 (2001–2002 Reg. Sess.) as amended June 26, 2002, § 1, p. 3; see Sen. Amends. to Assem. Bill No. 930 (2001–2002

---

[10] The remainder of section 66427.5, former subdivision (d) was redesignated subdivision (f). (Stats. 2002, ch. 1143, § 1, p. 7398.)

Reg. Sess.) as amended Aug. 13, 2002, § 1, p. 2.) The Assembly floor analysis of the final version of the 2002 bill stated that "[t]he fact that a majority of the residents do not support the conversion is not . . . an appropriate means for determining the legitimacy of a conversion. The law is not intended to allow park residents to block a request to subdivide." (Assem. Conc. Sen. Amends. to Assem. Bill No. 930 (2001–2002 Reg. Sess.) as amended Aug. 26, 2002, p. 5.)

In what is known as a "plus section,"[11] the Legislature explained the amendments it adopted: "It is the intent of the Legislature to address the conversion of a mobilehome park to resident ownership that is not a bona fide resident conversion, as described by the Court of Appeal in [*El Dorado, supra,*] 96 Cal.App.4th 1153. The court in [*El Dorado*] concluded that the subdivision map approval process specified in [section 66427.5] may not provide local agencies with the authority to prevent non[-]bona fide resident conversions. The court explained how a conversion of a mobilehome park to resident ownership could occur without the support of the residents and result in economic displacement. It is, therefore, the intent of the Legislature in enacting this act to ensure that conversions pursuant to Section 66427.5 of the Government Code are bona fide resident conversions." (Stats. 2002, ch. 1143, § 2, pp. 7399–7400.)

### C. *Analysis*

██ Goldstone contends that *Sequoia Park* and *Colony Cove Properties, LLC v. City of Carson* (2010) 187 Cal.App.4th 1487 [114 Cal.Rptr.3d 822] (*Colony Cove*) establish that County is precluded from relying on the results of the resident survey in deciding whether or not to approve a conversion application. County, HOA and amici curiae assert that *Sequoia Park* is of limited use, but urge this court to rely on *Colony Cove*'s analysis of section 66427.5, subdivisions (d)(5) and (e). As we shall explain, both of these cases are distinguishable, and to the extent they address the salient issue presented in this case, their pronouncements are dicta.

In *Sequoia Park, supra,* 176 Cal.App.4th 1270, the court reviewed a County of Sonoma ordinance, the professed aim of which was to " 'implement[]' " section 66427.5 and " '[t]o ensure that conversions of mobile home

---

[11] A "plus section" is "a provision of a bill that is not intended to be a substantive part of the code section or general law that the bill enacts, but to express the Legislature's view on some aspect of the operation or effect of the bill. Common examples . . . include severability clauses, saving clauses, statements of the fiscal consequences of the legislation, . . . and provisions declaring an intent to overrule a specific judicial decision or an intent not to change existing law." (*People v. Allen* (1999) 21 Cal.4th 846, 858–859, fn. 13 [89 Cal.Rptr.2d 279, 984 P.2d 486].) These "statements of the intent of the enacting body . . . while not conclusive, are entitled to consideration[,] . . . [and] properly may be utilized as an aid in construing a statute." (*People v. Canty* (2004) 32 Cal.4th 1266, 1280 [14 Cal.Rptr.3d 1, 90 P.3d 1168].)

parks to resident ownership are bona fide resident conversions in accordance with state law.' " (*Sequoia Park, supra,* at pp. 1274, 1288.) Pursuant to the ordinance, conversions garnering support from more than 50 percent of residents were presumed to be bona fide, whereas those with the support of less than 20 percent of residents were presumed not to be bona fide. (*Id.* at pp. 1291–1292.) If less than 50 percent and more than 20 percent of residents supported the conversion, the subdivider was required to present a viable plan to convey the majority of the lots to current residents in order to demonstrate the conversion was bona fide. (*Id.* at p. 1292.)

The court noted that in 2002 the Legislature, while expressly acknowledging the decision in *El Dorado,* failed to amend the language of (now) section 66427.5, subdivision (e), expressly limiting "[t]he scope of the hearing . . . to the issue of compliance with this section." The Legislature's failure to change this language, the court found, was instructive, and implied the Legislature approved "the *El Dorado* court's reading of the extent of local power to step beyond the four corners of [section 66427.5]." (*Sequoia Park, supra,* 176 Cal.App.4th at p. 1297.) Because the ordinance imposed requirements beyond those listed in section 66427.5, including "percentage-based presumptions" used to gauge the bona fide nature of the conversion application, the ordinance directly conflicted with the statutory language and was invalid. (*Sequoia Park, supra,* at p. 1299.)

*Colony Cove* addressed not just the validity of an ordinance purporting to regulate mobilehome conversion applications, but also the question of how to square subdivisions (d) and (e) of section 66427.5. In *Colony Cove,* the trial court ruled that a local agency has a ministerial duty under section 66427.5 to decide whether the statute's requirements have been met, but has no discretion to evaluate the contents of the resident survey in deciding whether to approve the conversion application. (*Colony Cove, supra,* 187 Cal.App.4th at p. 1495.) The Court of Appeal reversed, holding that the ordinance was invalid as it gave rights to residents and imposed obligations on mobilehome park owners beyond those enumerated in section 66427.5. (*Colony Cove, supra,* at p. 1508.)

The court further rejected the trial court's finding that a local agency had a purely ministerial duty of merely determining if an applicant had complied with section 66427.5's requirements, because that finding "fails to satisfactorily reconcile the language of the 2002 amendments with the stated intent of the Legislature." (*Colony Cove, supra,* 187 Cal.App.4th at p. 1505.) The court explained that the terms of section 66427.5, subdivision (e), particularly "the phrase 'limited to the issue of compliance with this section[,]' must be interpreted in light of the new language of the preceding subdivision (d)." (*Colony Cove, supra,* at p. 1505.) Because section 66427.5, subdivision (d)(5)

requires the applicant to submit "the results" of the resident support survey, it seems that "the *contents* of the survey, as opposed to its mere existence, are relevant to the approval process." (*Colony Cove, supra,* at p. 1505, italics added.) "By thereafter specifically stating that the results are 'to be considered as part of the subdivision map hearing prescribed by subdivision (e),' the Legislature made that intention explicit." (*Ibid.*) Any other construction of the statute "would consign the 'to be considered' language of subdivision (d)(5) to surplusage." (*Id.* at p. 1506.)

Unlike in *Sequoia Park* and *Colony Cove,* we are not called upon here to pass on the validity of a conversion ordinance. Following the publication of *Sequoia Park,* County repealed its conversion ordinance and rescinded its 2009 denial of Goldstone's application, referring the matter back to the planning commission for rereview. Consequently, neither the validity of County's now repealed ordinance nor the propriety of County's initial denial of Goldstone's application is before us.

As a result, we are left with the question of how to interpret two seemingly contradictory legislative directives: (1) section 66427.5, subdivision (d)(5)'s requirement that the "results" of the resident survey be submitted to the local agency "to be considered" as part of the conversion application hearing, and (2) section 66427.5, subdivision (e)'s restriction that the scope of the conversion application hearing is "limited to the issue of compliance with . . . section [66427.5]."

*Sequoia Park* is of limited assistance in resolving this question. The opinion made little more than a passing reference to section 66427.5, subdivision (d)(5) and certainly did not undertake any analysis of how that subdivision might be squared with section 66427.5, subdivision (e). Nor did it need to. The sole question before the court was the validity of the County of Sonoma's ordinance and any decision the court might have rendered about how to reconcile subdivision (d)(5) with subdivision (e) would necessarily have been dicta.

Similarly, though *Colony Cove* analyzed the interplay of these two subdivisions, the court's resolution of the question was not necessary to the disposition and is almost certainly dicta. Like *Sequoia Park,* the court in *Colony Cove* addressed the validity of a conversion application ordinance. Ultimately, that ordinance was found invalid as it was an " 'improper addition[] to the exclusive statutory requirements of section 66427.5.' " (*Colony Cove, supra,* 187 Cal.App.4th at p. 1508, quoting *Sequoia Park, supra,* 176 Cal.App.4th at pp. 1291–1292, 1298–1299.) Accordingly, there was no need for the court to analyze section 66427.5, subdivisions (d)(5) and (e) and its rejection of the trial court's conclusion that the local agency's duties under section 66427.5 were purely ministerial was superfluous.

■ Just because it is dictum, however, does not mean that the analysis set forth in *Colony Cove* is incorrect. Section 66427.5, subdivision (d)(5) requires that the owner submit the "results" of the survey to the local agency. If, as Goldstone contends, the scope of the hearing is strictly limited to the question of the owner's "compliance" with the statute per section 66427.5, subdivision (e), why bother submitting the "results" of the survey to the local agency, rather than mere proof of compliance with section 66427.5? If Goldstone's interpretation is correct, the survey's results are irrelevant, at least as far as the local agency is concerned, so why specify that they be submitted? If the Legislature simply wanted the hearing to be about compliance with the statute, it could have directed that the applicant submit just the survey form, along with sufficient proof of compliance with section 66427.5's other directives.

The remainder of section 66427.5, subdivision (d)(5) tells us what the Legislature intended the local agency to do with those results—it intended that they are "to be considered as part of the subdivision map hearing required by subdivision (e)." "Consider," as a transitive verb, is defined as follows: "1: to think about carefully: as a: to think of esp. with regard to taking some action . . . . b: to take into account . . . 2: to regard or treat in an attentive or kindly way . . . 3: to gaze on steadily or reflectively 4: to come to judge or classify . . . 5: regard . . . 6: suppose." (Merriam-Webster's Collegiate Dict. (10th ed. 1999) p. 246.) As an intransitive verb, "consider" is defined as "reflect, deliberate." (*Ibid.*) Accordingly, the plain meaning of subdivision (d)(5) directs the local entity or agency to "think about carefully" or "deliberate" upon the results of the resident survey as part of the hearing. If the Legislature intended the local entity or agency to tick boxes on a compliance checklist and rubberstamp all applications where the appropriate boxes were marked, it would not have directed the applicant to submit the results of the resident survey, nor would it have directed that those results "be considered" as part of the hearing.

■ What then of subdivision (e)'s requirement that the scope of the hearing is "limited to the issue of compliance with" section 66427.5? Section 66427.5 requires the owner to perform certain acts prior to the hearing, such as preparing a report on the conversion's impact on residents (§ 66427.5, subd. (b)) in addition to conducting the survey of resident support. "Compliance" is defined as "a: the act or process of complying to a desire, demand, or proposal or to coercion b: conformity in fulfilling official requirements." (Merriam-Webster's Collegiate Dict., *supra*, p. 236.) In the context of a subdivision map hearing, the latter definition, i.e., "conformity in fulfilling official requirements," is more applicable. So, if the application hearing is limited to the issue of whether or not there was "conformity in fulfilling official requirements," does this preclude the local agency from taking into account the results of the resident support survey, as opposed to simply

acknowledging that such a survey was conducted as required by the statute? We think not. Construing subdivision (e) in such a way as to allow a local agency or entity to consider the results of the resident support survey does less violence to the statute than construing it in a way that renders section 66427.5, subdivision (d)(5) as mere surplusage.

Like *Colony Cove*, we acknowledge that our holding in this case does not provide much, if any, guidance to local agencies or entities about how to manage mobilehome conversion applications. (*Colony Cove, supra*, 187 Cal.App.4th at p. 1508, fn. 18.) Though they are precluded, under *Sequoia Park, supra*, 176 Cal.App.4th 1270, from promulgating ordinances requiring specified levels of resident support, section 66427.5, subdivision (d)(5) instructs them to consider the results of the resident support surveys in passing on conversion applications, but offers no direction on the appropriate use of those results. We think everyone concerned, from mobilehome park owners to mobilehome residents to the local agencies and entities, would benefit from such instruction, as it would make the conversion application process more transparent and less uncertain. That, however, is a task for the Legislature, not the courts.

## III. *Disposition*

The judgment is affirmed. Respondents are awarded their costs on appeal.

Rushing, P. J., and Elia, J., concurred.

Appellant's petition for review by the Supreme Court was denied October 24, 2012, S204943. Baxter, J., did not participate therein. Kennard, J., and Werdegar, J., were of the opinion that the petition should be granted.