[No. E053467. Fourth Dist., Div. Two. Oct. 31, 2012.]

CHINO MHC, LP, Plaintiff and Appellant, v.
CITY OF CHINO et al., Defendants and Appellants;
LAMPLIGHTER CHINO HOMEOWNERS ASSOCIATION, Intervener and
Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts IV.A., VI., and VII.

## COUNSEL

Law Offices of Richard Pech, Richard Pech; Gilchrist & Rutter, Richard H. Close, Thomas W. Casparian and Yen N. Hope for Plaintiff and Appellant.

Aleshire & Wynder, Sunny K. Soltani and Jeff M. Malawy for Defendants and Appellants.

Law Office of William J. Constantine and William J. Constantine for Intervener and Appellant.

**OPINION**

**RICHLI, J.**—Chino MHC, LP (the Owner), owns Lamplighter Chino Mobile Home Park in Chino. It applied to the City of Chino (the City) to convert the park to resident ownership. This is analogous to converting an apartment building into a condominium; it would mean subdividing the park into individual lots, which would be offered for sale to the residents.

Resident ownership conversions are governed by Government Code section 66427.5 (section 66427.5). Three provisions of section 66427.5 are crucial in this case. First, section 66427.5 requires the park owner to conduct a "survey of support" to determine how many residents support the proposed conversion. (*Id.*, subd. (d)(1).) The survey must be "conducted in accordance with an agreement between the subdivider and a resident homeowners' association, if any . . . ." (*Id.*, subd. (d)(2).) Second, it prohibits a local agency from denying a conversion application for any reason other than the park owner's noncompliance with the requirements of section 66427.5 (including the survey requirement). (*Id.*, subd. (e).) Third, it provides that, once the conversion goes into effect, the park owner obtains partial immunity from local rent control. (*Id.*, subd. (f).)

Here, the Owner conducted a survey, but not pursuant to any agreement with any homeowners association; there is a dispute as to whether there was a homeowners association at the time. The vast bulk of the residents simply did not respond, but of the handful who did, 58 percent opposed the conversion.

The City found that the Owner's application was incomplete, because, among other things, it did not show that the survey had been properly conducted (i.e., that it had been conducted pursuant to an agreement with a homeowners association, or, alternatively, that there was no homeowners association).

The Owner's response was twofold. It sued the City, seeking a declaration that its application was complete. Meanwhile, however, it asked Lamplighter Chino Homeowners Association (the Association), which had been identified as the homeowners association for the park, to enter into an agreement regarding another survey. The second prong of this strategy failed; the Association was evasive, and eventually it refused to agree to any survey. The first prong, however, succeeded, at least in the short run; the City stipulated to a judgment requiring it to accept the application as complete. The planning commission even approved the application. The residents of one lot, however, appealed to the city council. The city council then denied the application,

citing (1) the results of the survey and (2) the lack of evidence that the survey had been properly conducted.

The Owner then filed this mandate proceeding, naming the City and the city council as defendants. The Association intervened. The trial court granted the Owner's petition. It ruled that:

1. Section 66427.5 prohibited the City from denying the application based on the results of the survey.

2. The stipulated judgment collaterally estopped the City from finding that the survey had not been properly conducted.

The City, the city council, and the Association (collectively appellants) appealed. The Owner cross-appealed, raising a relatively minor issue.

We will conclude that the trial court reached the right result, although we get there via different reasoning.

First, we will hold that the City was entitled to consider the survey results. However, it could not deny the application based on the survey results unless they showed that the conversion was a sham—intended solely to avoid rent control and not to transfer ownership to residents. The results of the Owner's survey showed that the conversion, although it did not have majority support, was not a sham.

Second, even aside from collateral estoppel, under the Permit Streamlining Act (Gov. Code, § 65920 et seq.), once the City accepted the Owner's application as complete, it could not deny the application based on lack of evidence that the survey had been properly conducted.

Accordingly, we will affirm.

I.

FACTUAL BACKGROUND

A. *The Owner Conducts a Survey.*

In December 2007, the Owner held a meeting of the residents to discuss the proposed conversion. Out of the 260 households, at least 140 people attended. A representative of the Owner asked how many of those present were aware of a functioning homeowners association in the park; 25 people

raised their hands. Then she asked how many were members of the home-owners association; 10 people raised their hands.

On April 3, 2008, the Owner held another residents' meeting. This time, approximately 60 people attended. One was George Klotz. Klotz stated that he "ran" the homeowners association and that it was " 'legitimate.' " Approximately eight people present indicated that they were members of Klotz's association. Others, however, said that Klotz's association was "radical" and "unreasonable" and that very few residents were affiliated with it.

On April 19, 2008, the Owner held a third residents' meeting. Approximately 40 people showed up, including Klotz. Some of the residents commented that Klotz's association was a "self-appointed" group of perhaps four or five people and that they were not affiliated with it.

In August 2008, representatives of the Owner contacted residents individually and asked them about the existence of a homeowners association. Apparently for reasons of time, however, they contacted only 83 households. Of these, 35 said they were members of a homeowners association, 13 said they had voted for representatives, and only eight were able to name any of the representatives. The representatives named were George Klotz, Lisa Blandino, and Kathy Morgan.[1]

At this point, the Owner decided that there was no "resident homeowners' association" within the meaning of section 66427.5, subdivision (d)(2).[2]

Earlier, however, on April 18, 2008, an attorney named Eduardo Madrid had written to the City (with a copy to the Owner), asserting that his client, the Association, was "the one and only bona fide homeowners association representing all of the residents at this park" and that its officers were Klotz, Blandino, and Morgan.

The Owner proceeded to prepare a survey, based on a standard form provided by the state Department of Housing and Community Development. It provided five check boxes:

1. "I support the [conversion] if the purchase price . . . is affordable to me."

---

[1] The Association claims that residents responded incompletely or not at all because they found these contacts to be "an intimidating and horrible intrusion into [the] sanctity of their independent homeowners' association . . . ." However, it does not cite any evidence in the record supporting this claim (see Cal. Rules of Court, rule 8.204(a)(1)(C)), and we have not found any.

[2] The foregoing facts are taken from the declaration of Susy Forbath. In an unpublished part of this opinion we reject appellants' contention that the Forbath declaration is not properly part of the record.

2. "I support the [conversion], but I am low income/moderate income and will need financial assistance to be able to purchase my unit."

3. "I support the [conversion], but at this time I believe that I would remain and rent."

4. "I decline to respond at this time."

5. "I do not support the [conversion]:"

On September 18, 2008, the Owner distributed the survey to residents, with a self-addressed stamped envelope; it set a deadline to respond of October 1, 2008. Out of the 260 households, only 36 returned the survey. Fourteen supported the conversion, of which seven checked box 1., eight checked box 2., and two checked box 3.;[3] 19 did not support the conversion; and three declined to respond.

### B. *The Owner Submits a Conversion Application.*

In October 2008, the Owner applied to the City to convert the park to resident ownership. In November 2008, the City notified the Owner that it deemed the application incomplete, for a number of reasons,[4] including that the Owner had not provided proof that the survey had been conducted in accordance with an agreement with an independent resident homeowners association, "if any."

### C. *The Owner Appeals Incompleteness to Planning Commission.*

The Owner appealed the incompleteness determination to the planning commission. In May 2009, the planning commission held a hearing on the appeal. At that hearing, the Owner submitted the declaration of Susy Forbath, which described the Owner's efforts to determine whether there was a homeowners association. (See pt. I.A., *ante.*)

Joe Diaz and Lisa Blandino appeared at the hearing. Diaz stated that he was president of the homeowners association; Blandino stated that she was

---

[3] Three people checked both box 1. and box 2. Because of the way the boxes were worded, this meant, somewhat contradictorily, that they supported the conversion *if* it was affordable and they supported the conversion *unconditionally* (though they would need financial assistance to purchase). Only four people checked box 1. but not box 2. and thus indicated that they supported the conversion *only* if it was affordable.

[4] The City also demanded a breathtaking array of items that were seemingly irrelevant to a conversion of a mobilehome park to resident ownership, including an application for a zoning change, a reduction in the number of units from 260 to 142, a grading plan, geological and soils reports, and the dedication of a portion of the land to parkland.

vice-president. They added that the homeowners association had been in existence since 1973 and that it had bylaws, minutes, and a bank account.

The planning commission denied the appeal.

D. *The Owner Appeals the Incompleteness Determination to the City Council.*

The Owner then appealed to the city council. In June 2009, the city council held a hearing on the appeal. Once again, Diaz and Blandino appeared and vouched for the existence of a homeowners association. The mayor even claimed to have personal knowledge of a homeowners association:

"MAYOR DENNIS YATES: . . . That homeowner association, I have on many occasions . . . through the years been up there and in fact, the trailer park owners used to—like Thanksgiving, they would supply the turkey and I remember Christmas, they'd supply the turkey for the homeowner's association and the Christmas tree. Do they still do that?[5]

"MR. JOSEPH DIAZ: Yes, they do.

"MAYOR DENNIS YATES: Okay.

"MR. JOSEPH DIAZ: Christmas and Thanksgiving, they put out a turkey dinner or whatever. The social club does honor it and the park—

"MAYOR DENNIS YATES: Yeah, because I remember going to some of the meetings up there with, with the homeowner's association, but it's news to me that, I guess, obviously, you haven't disbanded, have you?

"MR. JOSEPH DIAZ: No, we—

"MAYOR DENNIS YATES: Okay.

"MR. JOSEPH DIAZ:—1974.

"MAYOR DENNIS YATES: Yeah, I know. It's been years. Seventeen years that I know."

At the end of the hearing, the city council denied the appeal.

---

[5] Appellants assert that the homeowners association supplied the turkey dinners and Christmas trees. What the mayor actually said, however, was that the *park owner* supplied them *to* the homeowners association.

E. *The Owner Attempts to Work with Association.*

Meanwhile, the Owner attempted to obviate the City's concerns about the survey by conducting another survey, this time in cooperation with the homeowners association.

Accordingly, on May 8, 2009, an attorney for the Owner sent Diaz a proposed survey form and asked him to comment by May 22. Diaz did not respond.

On May 28, 2009, the Owner's attorney phoned Diaz. Diaz offered some comments, but he indicated that there had been "difficulty getting a group consensus." The attorney revised the survey form in accordance with Diaz's comments, mailed it to him, and asked him either to request further revisions or to approve it by June 4.

Diaz did not respond. Instead, on June 5, 2009, Madrid wrote to the Owner's attorney (with a copy to Diaz). He objected to the fact that the Owner's attorney had contacted the Association directly and insisted that he communicate .with it only through him. He also stated: "You and your client are fully cognizant that the residents are opposed to this conversion plan. In our view, your survey constitutes steadfast harassment, pure and simple. This harassment must come to an end, whether voluntarily or judicially. [¶] . . . [¶] Please govern yourself accordingly."

On June 16, 2009, Blandino wrote to the Owner's attorney. She stated that on June 9, Diaz had been removed as president. She added that Diaz had never had the authority "to communicate . . . regarding matters that were the business of the Executive Board and Association Membership." Contradicting the earlier letter from the Association's attorney, she stated that "[a]ny further communication regarding the Association must be in writing and sent to" Kathleen Morgan, as secretary.

On June 23, 2009, the Owner's attorney wrote back to Madrid. He noted that Madrid's letter "seems to indicate a refusal to participate in any further [s]urvey." Nevertheless, he asked that the Association either request further revisions to the proposed survey or approve it by June 30. Moreover, noting that Madrid's letter had been copied to Diaz, and that Diaz had allegedly been removed as president, he asked Madrid to provide evidence that he still represented the Association. Madrid did not respond.

On July 2, 2009, the Owner's attorney wrote to Morgan and asked her to respond to the letters previously sent to Diaz. He asked whether Madrid represented the Association; he also asked for the name of the current president of the Association. In addition, he requested a copy of the Association's bylaws, membership roster, and minutes, as well as documentation about how Diaz had been removed. He requested a response by July 10. The Association did not respond.

On July 17, 2009, the Owner's attorney wrote to Morgan again. He noted that the Association had not responded to any of his requests regarding the survey. He stated, "Please feel free to call or write to me to discuss this matter further. However, we now consider this issue closed."

On July 31, 2009, Blandino e-mailed the Owner's attorney. She identified herself as "acting president." She refused to provide any Association documents. She also stated: "You have failed to comply with the [City C]ouncil[']s request that you meet with us to discuss the survey. We are eager to negotiate those terms with you but will not respond further to anything other [than] to do with the conduct of the survey."

That same day, the Owner's attorney e-mailed Blandino. Noting, however, that he had been instructed to communicate with the Association only through Morgan, he asked her to copy Morgan on future e-mails. Yet again, he requested the Association's written comments on the proposed survey. He indicated that he was willing to meet with the Association in person to discuss any comments that it might have, and he asked, "Is the afternoon or evening of August 10 convenient?"

He concluded: "Finally, you must understand that your refusal to provide even the most basic evidence that your group is a legitimate representative of the residents of the Park will be taken as an admission that none exists. . . . [W]e intend to make our case to the court if necessary. However, if we can reach a reasonable agreement with your group to conduct another survey without further delay, we will pursue doing so."

The Association never responded.

F. *The Owner Files the Incompleteness Action.*

In August 2009, the Owner filed an action for a declaration that its application was, in fact, complete; it also requested a writ of mandate (the incompleteness action).

The incompleteness action was resolved by a stipulation in which the City agreed to deem the application complete and stipulated to the entry of a judgment to that effect. In November 2009, the trial court entered the stipulated judgment. The City duly notified the Owner that its application was deemed complete.

### G. The Planning Commission Approves the Application.

In March 2010, the planning commission held a hearing on the application. Bert Ashley appeared at the hearing and identified himself as president of the Association. He spoke in opposition to the application; however, he did not raise any issue regarding the survey. The planning commission approved the application.

### H. The Klotzes Appeal the Approval to the City Council.

George and Elizabeth Klotz, however, appealed the approval to the city council.[6] In their notice of appeal, they stated that the reason for the appeal was that a majority of residents opposed the conversion.

Three days before the date set for a public hearing, the Klotzes' attorney sent the City a letter brief. In it, he argued that the Owner's survey showed that a majority of residents were opposed to the conversion. However, he also argued that the survey had not been conducted in accordance with an agreement with the Association. Finally, he stated that, in 2008 and again in 2010, an overwhelming majority of park residents had signed petitions opposing the conversion. He attached a copy of the 2010 petition.

In April 2010, the city council held a public hearing on the appeal. The Owner's attorney argued that the incompleteness action had already determined that the survey had been properly conducted. The Klotzes' attorney, the Klotzes themselves, Ashley, Blandino, and other residents appeared and spoke against the conversion.

The city council granted the Klotzes' appeal, and thus it denied the Owner's application. It cited both "the results of the survey" and "the absence of any evidence" that the survey had been conducted "in accordance with" an agreement with a homeowners association, if any.

---

[6] The Klotzes had not appeared at the planning commission hearing. However, in the case of a proposed mobilehome resident ownership conversion, any tenant of the subject property may appeal. (Gov. Code, § 66452.5, subds. (a)(1), (b)(1); Chino Mun. Code, § 19.01.110.)

II.

## SECTION 66427.5

This case revolves around section 66427.5, which governs the conversion of rental mobilehome parks to resident ownership.

" 'The term "mobile home" is somewhat misleading. Mobile homes are largely immobile as a practical matter, because the cost of moving one is often a significant fraction of the value of the mobile home itself. They are generally placed permanently in parks; once in place, only about 1 in every 100 mobile homes is ever moved. [Citation.] A mobile home owner typically rents a plot of land, called a "pad," from the owner of a mobile home park. The park owner provides private roads within the park, common facilities such as washing machines or a swimming pool, and often utilities. The mobile home owner often invests in site-specific improvements such as a driveway, steps, walkways, porches, or landscaping. When the mobile home owner wishes to move, the mobile home is usually sold in place, and the purchaser continues to rent the pad on which the mobile home is located.' [Citation.]

"Thus, unlike the usual tenant, the mobilehome owner generally makes a substantial investment in the home and its appurtenances—typically a greater investment in his or her space than the mobilehome park owner. [Citation.] The immobility of the mobilehome, the investment of the mobilehome owner, and restriction on mobilehome spaces, has sometimes led to what has been perceived as an economic imbalance of power in favor of mobilehome park owners [citation] that has in turn led many California cities to adopt mobilehome rent control ordinances [citation]." (*Galland v. City of Clovis* (2001) 24 Cal.4th 1003, 1009–1010 [103 Cal.Rptr.2d 711, 16 P.3d 130].) The City, for example, has had mobilehome rent control since at least 1978. (Chino Mun. Code, § 2.68.010 et seq.)

Section 66427.5 was originally enacted in 1991. (Stats. 1991, ch. 745, § 2, p. 3324.) It is part of the Subdivision Map Act (Gov. Code, § 66410 et seq.). In broad general outline,[7] section 66427.5 allows the owner of a

---

[7] The complete text of section 66427.5 is as follows:
"At the time of filing a tentative or parcel map for a subdivision to be created from the conversion of a rental mobilehome park to resident ownership, the subdivider shall avoid the economic displacement of all nonpurchasing residents in the following manner:
"(a) The subdivider shall offer each existing tenant an option to either purchase his or her condominium or subdivided unit, which is to be created by the conversion of the park to resident ownership, or to continue residency as a tenant.

mobilehome park to subdivide it into individual lots so that, instead of renting their lots, residents may buy them. (§ 66427.5, subd. (a).) However, if residents choose not to buy—or if they cannot afford to buy—their lots become partially immune to local rent control. (*Id.*, subd. (f).)[8]

The owner—or "subdivider"—must prepare and make available a report on the impact that the conversion will have on residents. (§ 66427.5, subds. (b), (c).) Under subdivision (d) of section 66427.5 (subdivision (d)), the subdivider also must conduct a "survey of support . . . in accordance with an agreement between the subdivider and a resident homeowners' association, if any, that is independent of the subdivider . . . ." (Subd. (d)(2).)

---

"(b) The subdivider shall file a report on the impact of the conversion upon residents of the mobilehome park to be converted to resident owned subdivided interest.

"(c) The subdivider shall make a copy of the report available to each resident of the mobilehome park at least 15 days prior to the hearing on the map by the advisory agency or, if there is no advisory agency, by the legislative body.

"(d)(1) The subdivider shall obtain a survey of support of residents of the mobilehome park for the proposed conversion.

"(2) The survey of support shall be conducted in accordance with an agreement between the subdivider and a resident homeowners' association, if any, that is independent of the subdivider or mobilehome park owner.

"(3) The survey shall be obtained pursuant to a written ballot.

"(4) The survey shall be conducted so that each occupied mobilehome space has one vote.

"(5) The results of the survey shall be submitted to the local agency upon the filing of the tentative or parcel map, to be considered as part of the subdivision map hearing prescribed by subdivision (e).

"(e) The subdivider shall be subject to a hearing by a legislative body or advisory agency, which is authorized by local ordinance to approve, conditionally approve, or disapprove the map. The scope of the hearing shall be limited to the issue of compliance with this section.

"(f) The subdivider shall be required to avoid the economic displacement of all nonpurchasing residents in accordance with the following:

"(1) As to nonpurchasing residents who are not lower income households, as defined in Section 50079.5 of the Health and Safety Code, the monthly rent, including any applicable fees or charges for use of any preconversion amenities, may increase from the preconversion rent to market levels, as defined in an appraisal conducted in accordance with nationally recognized professional appraisal standards, in equal annual increases over a four-year period.

"(2) As to nonpurchasing residents who are lower income households, as defined in Section 50079.5 of the Health and Safety Code, the monthly rent, including any applicable fees or charges for use of any preconversion amenities, may increase from the preconversion rent by an amount equal to the average monthly increase in rent in the four years immediately preceding the conversion, except that in no event shall the monthly rent be increased by an amount greater than the average monthly percentage increase in the Consumer Price Index for the most recently reported period."

[8] The immunity is limited in two respects. First, it is phased in over time; the preconversion rent may be increased to market level in equal annual increments over a four-year period. (§ 66427.5, subd. (f)(1).) Second, with respect to "lower income households" (as defined by the federal government), any rent increase cannot exceed the average increase over the preceding four years and also cannot exceed the increase in the Consumer Price Index. (*Id.*, subd. (f)(2); see Health & Saf. Code, § 50079.5.)

Under subdivision (e) of section 66427.5 (subdivision (e)), the responsible local agency must hold a public hearing before approving or disapproving the conversion. Subdivision (d) provides that the subdivider must submit the results of the survey "to the local agency . . . , to be *considered* as part of the subdivision map hearing prescribed by subdivision (e)." (Subd. (d)(5), italics added.) Subdivision (e), however, then provides that "[t]he scope of the hearing shall be limited to the issue of compliance with this section."

## III.

## DISAPPROVAL OF THE CONVERSION BASED ON THE RESULTS OF THE SURVEY

The City denied the Owner's application based, in part, on "the results of the survey of support . . . ." The trial court ruled that the "survey, which showed a lack of majority support for the conversion, cannot be the basis of [the] City's denial of Petitioner's Application, according to G[overnment] C[ode] section 6642[7].5." Appellants contend that this was error and that the City could deny the application based on the results of the survey.

This contention turns on the construction of section 66427.5 and particularly of subdivisions (d) and (e). "Statutory interpretation is a question of law that we review de novo. [Citation.]" (*Bruns v. E-Commerce Exchange, Inc.* (2011) 51 Cal.4th 717, 724 [122 Cal.Rptr.3d 331, 248 P.3d 1185].)

### A. *The Statutory Text.*

Subdivision (d) requires the subdivider to conduct a survey. It then provides that "[t]he results of the survey shall be submitted to the local agency . . . , to be considered as part of the . . . hearing prescribed by subdivision (e)." (Subd. (d)(5).) It would seem pointless to require the local agency to "consider" the results yet forbid it to act on them.

Subdivision (e), however, provides that "[t]he scope of the hearing shall be limited to the issue of *compliance* with this section." (Italics added.) The Owner argues that the subdivider has "complied" by conducting and submitting the survey, regardless of the results of the survey.

Appellants argue, however, that the statute requires not just a survey, but a "survey *of support.*" (Subd. (d)(1), italics added.) Thus, if the survey does not show that residents support the conversion, the subdivider has not complied. The Owner, of course, would respond that "survey of support" simply means a survey as to *whether or not* residents support the conversion; the Legislature could have said a "survey *showing* support," but it did not.

The statute is ambiguous; both sides' interpretations are tenable. Therefore, we can and should look to the legislative history. (*Klein v. United States of America* (2010) 50 Cal.4th 68, 77 [112 Cal.Rptr.3d 722, 235 P.3d 42].)

## B. Our *El Dorado* Decision.

As we will discuss, the Legislature enacted subdivision (d) as its response to this court's decision in *El Dorado Palm Springs, Ltd. v. City of Palm Springs* (2002) 96 Cal.App.4th 1153 [118 Cal.Rptr.2d 15] (Fourth Dist., Div. Two). Hence, we begin with *El Dorado*.

There, a city had imposed several conditions on a proposed mobilehome conversion to prevent it from being "a sham or fraudulent transaction which was intended to avoid the rent control ordinance." (*El Dorado Palm Springs, Ltd. v. City of Palm Springs, supra*, 96 Cal.App.4th at p. 1165; see *id.* at p. 1157.)[9] We noted that under section 66427.5 once even a single lot is sold rent control immunity starts to take effect on *all* of the lots. (*El Dorado*, at p. 1166.) Thus, section 66427.5 creates an incentive for "sham conversions," designed to avoid rent control rather than to transfer ownership to residents. (See *El Dorado*, at pp. 1165–1166.) The paradigm case of a sham conversion would be one "in which a single unit is sold, but no others, and the park owner then claims a local rent control ordinance is preempted by section 66427.5, subdivision (d)." (*Id.* at p. 1166, fn. 10.)

Nevertheless, we held that the conditions were invalid under what is now subdivision (e): "[T]he City Council, in acting on [the owner's] application for approval of the tentative subdivision map, only had the power to determine if [the owner] had complied with the requirements of the section. [Citation.] It therefore had no power to impose . . . further mitigating conditions . . . ." (*El Dorado Palm Springs, Ltd. v. City of Palm Springs, supra*, 96 Cal.App.4th at pp. 1163–1164.) We expressed confidence that "the courts will not apply section 66427.5 to sham or unsuccessful conversions." (*Id.* at p. 1166, fn. 10; see *id.* at p. 1165.)

## C. The Legislative History of Subdivision (d).

In response to *El Dorado* (Stats. 2002, ch. 1143, § 2, pp. 7399–7400), the Legislature amended section 66427.5 by adding subdivision (d) (Stats. 2002, ch. 1143, § 1, pp. 7398–7399).

---

[9] The conditions required "(1) the use of a 'Map Act Rent Date,' defined as the date of the close of escrow of not less than 120 lots; (2) the use of a sale price established by a specified appraisal firm . . . ; and (3) financial assistance to all residents in the park to facilitate their purchase of the lots . . . ." (*El Dorado Palm Springs, Ltd. v. City of Palm Springs, supra*, 96 Cal.App.4th at p. 1157.)

The amendment, as originally introduced in the Assembly, would have allowed a local agency to impose "additional conditions of approval . . . to preserve affordability or to protect nonpurchasing residents from economic displacement." (Assem. Bill No. 930 (2001–2002 Reg. Sess.) as amended June 26, 2002, italics omitted.)[10]

A Senate committee analysis, however, asked, "Is the real problem in the El Dorado case the inability of local jurisdictions to impose more stringent displacement protections for non-purchasing residents or the failure of the state law to better define what constitutes a bona fide resident park conversion? There may be other alternatives to assure that future conversions to resident ownership are legitimate. These might include a requirement for homeowners to sign documents as part of a map requirement evidencing 51%, or a higher percentage, support for the proposed conversion at the front end." (Sen. Com. on Housing and Community Development, Analysis of Assem. Bill No. 930 (2001–2002 Reg. Sess.) as amended June 26, 2002, p. 4.)[11]

Thereafter, the Senate amended the bill by eliminating the provision allowing conditions of approval and replacing it with a provision that rent control immunity would not start to phase in until more than 50 percent of the lots were sold. (Assem. Bill No. 930 (2001–2002 Reg. Sess.) as amended Aug. 13, 2002.)[12]

Shortly afterward, however, the Senate amended the bill again, eliminating this provision and replacing it with present subdivision (d), requiring a "survey of support." (Assem. Bill No. 930 (2001–2002 Reg. Sess.) as amended Aug. 26, 2002, italics omitted.)[13]

According to a subsequent Assembly floor analysis of the Senate amendments, "[t]his bill seeks to ensure that the conversion is not a sham conversion by requiring a vote of the residents to be submitted to the local agency. Essentially, the bill is addressing a statement by the court in El Dorado that, 'the courts will not apply section 66427.5 to sham or failed transactions, or to avoid a local rent control ordinance.' Making this determination would not be easy for a local agency that did not proactively seek to inquire with the residents on their position.

---

[10] Available at <http://www.leginfo.ca.gov/pub/01-02/bill/asm/ab_0901-0950/ab_930_bill_20020626_amended_sen.html> (as of Oct. 31, 2012).

[11] Available at <http://www.leginfo.ca.gov/pub/01-02/bill/asm/ab_0901-0950/ab_930_cfa_20020627_132209_sen_comm.html> (as of Oct. 31, 2012).

[12] Available at <http://www.leginfo.ca.gov/pub/01-02/bill/asm/ab_0901-0950/ab_930_bill_20020813_amended_sen.html> (as of Oct. 31, 2012).

[13] Available at <http://www.leginfo.ca.gov/pub/01-02/bill/asm/ab_0901-0950/ab_930_bill_20020826_amended_sen.html> (as of Oct. 31, 2012).

"This bill seeks to provide a measure of that support for local agencies to determine whether the conversion is truly intended for resident ownership, or if it is an attempt to preempt a local rent control ordinance. The results of the survey would not affect the duty of the local agency to consider the request to subdivide pursuant to Section 66427.5 but merely provide additional information. It is foreseeable that the results of this survey could be used to argue to a court that the conversion is a sham and that the rent formulas in Section 66427.5 should not be applied.

"The fact that a majority of the residents do not support the conversion is not however an appropriate means for determining the legitimacy of a conversion. The law is not intended to allow park residents to block a request to subdivide. Instead, the law is intended to provide some measure of fiscal protection to n[o]npurchasing residents." (Assem. Conc. Sen. Amends. to Assem. Bill No. 930 (2001–2002 Reg. Sess.) as amended Aug. 26, 2002, pp. 4–5 (hereafter Floor Analysis).)[14]

The bill as enacted included the following uncodified statement of intent: "It is the intent of the Legislature to address the conversion of a mobilehome park to resident ownership that is not a bona fide resident conversion, as described by the Court of Appeal in El Dorado Palm Springs, Ltd. v. City of Palm Springs (2002) 96 Cal.App.4th 1153 [118 Cal.Rptr.2d 15]. The court in this case concluded that the subdivision map approval process specified in Section 66427.5 of the Government Code may not provide local agencies with the authority to prevent non[-]bona fide resident conversions. The court explained how a conversion of a mobilehome park to resident ownership could occur without the support of the residents and result in economic displacement. It is, therefore, the intent of the Legislature in enacting this act to ensure that conversions pursuant to Section 66427.5 of the Government Code are bona fide resident conversions." (Stats. 2002, ch. 1143, § 2, pp. 7399–7400.)

D. *The Enrolled Bill Report.*

Appellants ask us to consider, as part of the legislative history, an enrolled bill report prepared by the Department of Housing and Community Development. It stated that the bill would require the subdivider to "obtain a survey from the mobilehome park residents demonstrating their *support* of a conversion . . . ." (Housing and Community Development Dept., Enrolled Bill Rep. on Assem. Bill No. 930 (2001–2002 Reg. Sess.) Aug. 26, 2002, p. 1, italics added (hereafter Enrolled Bill Rep.).) "This bill would give local agencies the

---

[14] Available at <http://www.leginfo.ca.gov/pub/01-02/bill/asm/ab_0901-0950/ab_930_cfa_20020831_030744_asm_floor.html> (as of Oct. 31, 2012).

authority to consider the result of a (nonbinding) resident vote on a proposed . . . conversion . . . ." (*Id.* at p. 2.)

It continued: "Advocates for the bill point out that this bill would help close a loophole that permits a park owner-driven conversion . . . even where the conversion is not favored by, nor is in the interests of the park residents." (Enrolled Bill Rep., *supra*, at p. 2.) "By requiring the subdivider . . . to survey the park residents and assess their genuine interest in a conversion . . . , this bill may prevent park-owner driven conversions from occurring." (*Id.* at p. 1.)

The Enrolled Bill Report noted, however, "[t]he bill . . . does not clearly establish how the survey is to be conducted or what evidences resident support. For example, if only 40% of the park residents respond to the survey, and only 51% of them support the park conversion, has resident support been demonstrated?" (Enrolled Bill Rep., *supra*, at p. 2.)

■ " 'An "enrolled bill report" is prepared by a department or agency in the executive branch that would be affected by the legislation. Enrolled bill reports are typically forwarded to the Governor's office before the Governor decides whether to sign the enrolled bill.' [Citation.]" (*In re Lucas* (2012) 53 Cal.4th 839, 855, fn. 13 [137 Cal.Rptr.3d 595, 269 P.3d 1160].) The Supreme Court has "routinely found enrolled bill reports, prepared by a responsible agency contemporaneous with passage and before signing, instructive on matters of legislative intent." (*Elsner v. Uveges* (2004) 34 Cal.4th 915, 934, fn. 19 [22 Cal.Rptr.3d 530, 102 P.3d 915].)

This practice has been criticized, for several reasons. As this court has noted, "it is not reasonable to infer that enrolled bill reports prepared by the executive branch for the Governor were ever read by the Legislature." (*McDowell v. Watson* (1997) 59 Cal.App.4th 1155, 1161–1162, fn. 3 [69 Cal.Rptr.2d 692] [Fourth Dist., Div. Two].) " 'Moreover, to permit consideration of enrolled bill reports as cognizable legislative history gives the executive branch an unwarranted opportunity to determine the meaning of statutes. That is the proper and exclusive duty of the judicial branch of government.' [Citation.]" (*Joyce v. Ford Motor Co.* (2011) 198 Cal.App.4th 1478, 1492–1493 [131 Cal.Rptr.3d 548].)

Thus, while the Supreme Court finds enrolled bill reports instructive, it does not necessarily give them "great weight." (*Elsner v. Uveges, supra,* 34 Cal.4th at p. 934, fn. 19.) It has also cautioned that "these reports certainly do not take precedence over more direct windows into legislative intent such as committee analyses . . . ." (*Conservatorship of Whitley* (2010) 50 Cal.4th 1206, 1218–1219, fn. 3 [117 Cal.Rptr.3d 342, 241 P.3d 840].)

Here, to the extent that the Enrolled Bill Report indicates that the local agency can consider the results of the survey, it is consistent with the Floor

Analysis. Additionally, it indicates that the "residents" must "support" the conversion or, conversely, that a "park owner-driven conversion" that is "not favored by . . . park residents" should be disapproved. However, this cannot be understood as meaning that all of the residents—or even a majority of the residents—must support the conversion; the report itself notes that the bill does not require any particular level of resident support.

If the Enrolled Bill Report could be understood as requiring majority support, it would be contrary to the Floor Analysis, which is entitled to greater weight. Indeed, here, the City concedes that "[s]ection 66427.5 does not establish a majority support threshold . . . ." And the Association concedes that section 66427.5 "does not require majority support . . . ." (Capitalization & boldface omitted.)

### E. *Senate Bill No. 444.*

The Owner asks us to consider, as part of the legislative history, Senate Bill No. 444, which was proposed but not enacted during the 2011–2012 Regular Session. This bill would have given a local agency discretion to "disapprove the [conversion] if it finds that the results of the survey have not demonstrated adequate resident support . . . ." (Sen. Bill No. 444 (2011–2012 Reg. Sess.) as introduced Feb. 16, 2011.)[15] In the Owner's view, by rejecting this bill, "the Legislature emphasized that local governments cannot condition approval of an Application on the level of resident support . . . ."

 "[T]he Legislature's failure to enact a proposed amendment to an existing statutory scheme offers only limited guidance, if any, concerning the Legislature's original intent. [Citations.]" (*Martin v. Szeto* (2004) 32 Cal.4th 445, 451 [9 Cal.Rptr.3d 687, 84 P.3d 374].) Accordingly, we decline to consider Senate Bill No. 444.

### F. *Interim Conclusions.*

To summarize, this legislative history shows that the Legislature considered allowing a local agency to impose conditions of approval but ultimately it rejected this approach. It also considered requiring the sale of a threshold number of lots, but it rejected this approach, too. It had before it a suggestion that it should require a specified minimum level of resident support, but it did not adopt it. Instead, the Legislature chose to require a survey of support.

The reason for requiring a survey was "to ensure that the conversion is not a sham conversion . . . ." (Floor Analysis, *supra*, at p. 4; see Stats. 2002, ch.

---

[15] Available at <http://www.leginfo.ca.gov/pub/11-12/bill/sen/sb_0401-0450/sb_444_bill_20110216_introduced.html> (as of Oct. 31, 2012).

1143, § 2, pp. 7399, 7400.) The survey would enable "local agencies to determine whether the conversion is truly intended for resident ownership, or if it is an attempt to preempt a local rent control ordinance." (Floor Analysis, at p. 5.) However, the survey requirement was not intended to enable park residents to block a conversion—not even when a majority of park residents are opposed to the conversion.

We therefore conclude that a local agency *is* entitled to deny a conversion application based on the survey results. However, it may do so only if the survey results show that the conversion is a sham. Only then can it be said that the subdivider, even though it has obtained a survey, has not "compli[ed]" with section 66427.5. The mere fact that a majority of residents are opposed to the conversion falls short of showing that the conversion is a sham. And the mere fact that the subdivider subjectively intends to obtain immunity from rent control also falls short. Section 66427.5 contemplates that a subdivider may be at least partly motivated by the prospect of avoiding rent control, as it intentionally provides such immunity. Thus, a sham conversion is one that is *merely* intended to avoid rent control and *not* to transfer ownership to residents. (See *El Dorado Palm Springs, Ltd. v. City of Palm Springs, supra,* 96 Cal.App.4th at pp. 1159, 1165.)

The Owner argues that the Legislature intended the survey results to become part of the public record so that a court could subsequently rely on them in finding that a conversion was a sham; however, it did not intend to allow the local agency to rely on them in making such a finding. The Legislature, however, indicated that the survey results could be used *either* by a local agency *or* by a court. For example, it said that, without a survey, it "would not be easy for a local agency" to determine whether a conversion was a sham. (Floor Analysis, *supra,* at p. 4.) It also said that the survey results "could be used to argue to a court that the conversion is a sham . . . ." (*Id.* at p. 5.)

The Owner's argument overlooks the nature of judicial review. Whether the court proceeds by way of traditional mandate (Code Civ. Proc., § 1085) or administrative mandate (Code Civ. Proc., § 1094.5), it must determine whether the local agency violated a duty. (*Excelsior College v. Board of Registered Nursing* (2006) 136 Cal.App.4th 1218, 1237 [39 Cal.Rptr.3d 618].) If a local agency had a duty to approve a conversion without considering the results of the survey, a court could not come along later and decide, based on the results of the survey, that the conversion should have been denied. Either both decision makers can consider the survey results or neither can.

G. *The Case Law.*

Since subdivision (d) was enacted, it has been discussed in three published cases. Although they are not entirely on point, they are all at least consistent with our conclusions.

1. *Sequoia Park.*

The first relevant case is *Sequoia Park Associates v. County of Sonoma* (2009) 176 Cal.App.4th 1270 [98 Cal.Rptr.3d 669]. There, a county had enacted an ordinance that was intended, at least in part, to ensure that mobilehome conversions were not sham. (*Id.* at pp. 1275, 1288.) The ordinance provided, among other things, that the county would approve a conversion only if it was bona fide. If the required survey showed less than 20 percent support, the conversion would be presumed not bona fide; if it showed more than 50 percent support, it would be presumed bona fide (*id.* at pp. 1291–1292); and if it showed between 20 and 50 percent support, the subdivider would be required to " 'demonstrate, at a minimum, that a viable plan, with a reasonable likelihood of success as determined by the decision-maker, is in place to convey the majority of the lots to current residents of the park within a reasonable period of time' " (*id.* at p. 1292).

The appellate court held that this provision of the ordinance (among others) was "preempted" by section 66427.5. (*Sequoia Park Associates v. County of Sonoma, supra,* 176 Cal.App.4th at pp. 1292–1300.) It relied heavily on *El Dorado,* noting: "[T]he Legislature amended section 66427.5 in the wake of *El Dorado.* Two features of that amendment are notable. First, the Legislature added what is now the requirement in subdivision (d) of a survey of tenant support for the conversion . . . . But the Legislature did not address the point noted in *El Dorado* that there is no minimum amount of tenant support required for a conversion to be approved. [Citation.] As this was the only addition to the statute, i[t] follows that it was deemed sufficient to address the problem of 'bona fide' conversions . . . ." (*Sequoia Park Associates v. County of Sonoma, supra,* 176 Cal.App.4th at p. 1296.)

It then explained that the ordinance's bona fide requirements went beyond the requirements of section 66427.5 because "[t]he matter of just what constitutes a 'bona fide conversion' according to the Ordinance appears. to authorize—if not actually invite—a purely subjective inquiry, one which is not truly reduced by reference to the Ordinance's presumptions. And although the Ordinance employs the mandatory 'shall,' it does not establish whether the presumptions are conclusive or merely rebuttable." (*Sequoia Park Associates v. County of Sonoma, supra,* 176 Cal.App.4th at pp. 1299–1300, fn. omitted.)

Significantly, *Sequoia Park* did not hold that a local agency cannot conduct *any* inquiry into whether a conversion is bona fide or sham. To the contrary, it noted that subdivision (d), requiring a survey, had been added, and it concluded that this "was deemed sufficient to address the problem of 'bona fide' conversions . . . ." (*Sequoia Park Associates v. County of Sonoma, supra,* 176 Cal.App.4th at p. 1296.) It never actually mentioned the fact that subdivision (d) also requires the local agency to "consider[]" the results of the survey. However, it follows that the court would have agreed with us that this was part of how the Legislature addressed the problem of bona fide conversions—it allowed the local agency to consider the results of the survey, as long as the agency did not set a minimum level of support or add subjective standards.

The Owner asserts that *Sequoia Park* "explicitly found that 'satisfying the survey . . . requirement imposed by section 66427.5' does not require a finding that 'the proposed conversion "is a bona fide resident conversion" ' *as measured against resident support.*" (Italics added.) Not so. Rather, the court indicated that "satisfying the survey . . . requirement[]" is different from showing that "the proposed conversion 'is a bona-fide resident conversion' *as measured against the percentage-based presumptions established by the Ordinance.*" (*Sequoia Park Associates v. County of Sonoma, supra,* 176 Cal.App.4th at p. 1299, fn. omitted, italics added.) Thus, it did not preclude a local agency from considering resident support, as long as the agency does not establish percentage-based presumptions like those in *Sequoia Park.*

### 2. *Colony Cove.*

The second case is *Colony Cove Properties, LLC v. City of Carson* (2010) 187 Cal.App.4th 1487 [114 Cal.Rptr.3d 822]. *Colony Cove* involved an ordinance with percentage-based presumptions almost identical to the ordinance in *Sequoia Park*: it provided that if the required survey showed that more than 50 percent of the residents supported the conversion, it would be presumed bona fide; if it showed that less than 35 percent of the residents supported the conversion, it would be presumed *not* bona fide; and if between 35 and 50 percent of the residents supported the conversion, the owner would be required to show that it had a viable plan to convey the majority of the lots to current residents within a reasonable time. (*Id.* at pp. 1491, 1492.)

The court opined that "the contents of the survey, as opposed to its mere existence, are relevant to the approval process." (*Colony Cove Properties, LLC v. City of Carson, supra,* 187 Cal.App.4th at p. 1505.) It relied on the provision of subdivision (d) that the survey results are " 'to be considered as part of the subdivision map hearing . . . .' " (*Colony Cove*, at p. 1505.)

The court held, however, that the ordinance "conflicts with section 66427.5 by 'deviating from the state-mandated criteria' and adding to the 'exclusive statutory requirements of section 66427.5.' [Citation.]" (*Colony Cove Properties, LLC v. City of Carson, supra*, 187 Cal.App.4th at p. 1506.) It explained: "The statute specifies the ways in which the subdivision must 'avoid the economic displacement of all nonpurchasing residents.' First, the subdivider must give each resident the option to purchase his or her unit or to continue residency at the park. [Citation.] Second, the subdivider must file a report on the impact of the conversion on the residents of the mobilehome park and make a copy of the report available to each resident. [Citation.] Third, the subdivider must obtain and submit the survey of support. [Citation.] Finally, the subdivider must limit postconversion increases in rents. [Citation.]

"The . . . ordinance gives residents additional rights not afforded by the statute. It essentially gives them veto power over the conversion by creating a presumption that the conversion is not bona fide if fewer than 35 percent of residents support it. This provision cannot be reconciled with the final Assembly floor analysis of the 2002 amendments, which specifically stated that '[t]he fact that a majority of the residents do not support the conversion is not . . . an appropriate means for determining the legitimacy of a conversion,' and that '[t]he law is not intended to allow park residents to block a request to subdivide.' [Citations.] The ordinance also greatly increases the owner's burden if fewer than 50 percent of residents support it, requiring preparation of a 'viable plan' to sell the majority of units to current residents." (*Colony Cove Properties, LLC v. City of Carson, supra*, 187 Cal.App.4th at pp. 1507–1508, fn. omitted.)

In a footnote, the court conceded: "We recognize that our conclusion—that section 66427.5 permits consideration of the results of the survey of support but not the promulgation of an ordinance requiring specific levels of resident support—does not resolve the manner in which . . . local agencies are to approach conversion applications. The uncertainty derives from the statute itself, which requires local agencies to consider resident survey results but provides no guidance as to how the results may be used." (*Colony Cove Properties, LLC v. City of Carson, supra*, 187 Cal.App.4th at p. 1508, fn. 18.)

Arguably, *Colony Cove*'s statement that a local agency can consider the results of the survey is dictum. Nevertheless, it is well-reasoned dictum, and we agree with it.

### 3. *Goldstone.*

The third case is *Goldstone v. County of Santa Cruz* (2012) 207 Cal.App.4th 1038 [143 Cal.Rptr.3d 906]. In *Goldstone*, the owner of a mobilehome park

conducted a survey of support pursuant to an agreement with the homeowners association. Out of 147 households in the park, 121 responded; two supported the proposed conversion, and 119 opposed it. (*Id.* at p. 1042.) The county then denied the park owner's conversion application, on the ground that the results of the survey showed "near unanimous opposition" to the conversion. (*Id.* at p. 1044.) The park owner filed a mandate petition, which the trial court denied. (*Id.* at p. 1045.)

The park owner appealed, arguing that the county had no authority to deny the conversion application based on lack of resident support. (*Goldstone v. County of Santa Cruz, supra*, 207 Cal.App.4th at pp. 1045–1046.) The appellate court, however, affirmed. It held that "subdivision (e) . . . allow[s] a local agency or entity to consider the results of the resident support survey . . . ." (*Id.* at p. 1054.) It reasoned that section 66427.5 requires the subdivider to submit the survey "results," not just proof that the survey has been conducted. (*Goldstone*, at p. 1053.) It also reasoned that, based on the dictionary definition of "consider," the "plain meaning" of subdivision (d) "directs the local entity or agency to 'think about carefully' or 'deliberate' upon the results of the resident survey as part of the hearing." (*Goldstone*, at p. 1053.)

The court also commented: "[W]e acknowledge that our holding in this case does not provide much, if any, guidance to local agencies or entities about how to manage mobilehome conversion applications. [Citation.] . . . [S]ection 66427.5, subdivision (d)(5) instructs them to consider the results of the resident support surveys in passing on conversion applications, but offers no direction on the appropriate use of those results. We think everyone concerned, from mobilehome park owners to mobilehome residents to the local agencies and entities, would benefit from such instruction, as it would make the conversion application process more transparent and less uncertain. That, however, is a task for the Legislature, not the courts." (*Goldstone v. County of Santa Cruz, supra*, 207 Cal.App.4th at p. 1054.)

For the reasons already stated, we agree with *Goldstone* that the local agency can deny a conversion application based on the results of the survey. However, we do not entirely agree that section 66427.5 offers "no direction on the appropriate use of th[e survey] results." As already discussed, the Legislature intended a local agency to be able to use them to determine whether a conversion is sham within the meaning of *El Dorado*. This issue was not squarely presented in *Goldstone*; hence, this language was dictum. Moreover, the court clearly indicated that it was not expressing any opinion on how a local agency could use the survey results. If, however, *Goldstone* could be viewed as holding that the survey results in that case—which showed that residents opposed the conversion by 119 to two, out of a

potential total of 147—were sufficient to support the denial of the conversion, we would agree. In our view, this would be almost the paradigm case of a sham conversion.

### H. *Application to These Facts.*

Having concluded that the City could at least consider the results of the survey, we turn to whether it abused its discretion by denying the application based on those results.

Out of those who stated any opinion at all, 14 out of 33 (42 percent) supported the conversion; 19 out of 33 (58 percent) opposed it. As already discussed, however, the mere fact that a majority of residents oppose a conversion does not show that it is a sham. We need not decide how large the majority would have to be to show this. Significantly, *Sequoia Park* and *Colony Cove* rejected presumptions that support levels of less than 20 percent and less than 35 percent, respectively, indicated a sham conversion. *El Dorado* suggests that the survey might have to show that only a trivial handful of lots would be sold; *Goldstone* is consistent with that approach. For purposes of this case, however, it suffices to hold that a majority of 58 to 42 percent is precisely the kind of bare majority that the Legislature did not intend to be able to block a conversion.[16]

Moreover, the vast majority of residents simply failed to respond. Appellants try to spin this by claiming the survey showed that only 14 out of the 260 total households, or 5 percent, supported the conversion. The Owner, however, could easily spin it the opposite way by claiming that only 19 out of the 260 total households, or 7 percent, opposed it. Actually, all the survey showed was that the majority of residents did not care enough to return the survey—not even when given a postage-paid envelope. This is affirmative evidence that the conversion was *not* a sham.

■ Appellants argue that the City could also consider the Association's 2010 petition opposing the conversion, which was signed by residents of 230 of the 260 lots. The problem with this is that, under subdivision (e), a local agency can consider only "compliance with this section," and under

---

[16] The Association argues that residents who indicated only "conditional" support should not be counted, because the Owner failed to show that the lots would be affordable or that adequate financial assistance would be available. Actually, residents who checked either box 2. or box 3. indicated that they supported the *conversion*, although they might not actually *purchase*. Only four residents indicated that they supported the conversion *only if* the purchase price was affordable. Even if those four are counted as opponents, however, the level of support would be 30 percent. Under *Sequoia Park* and *Colony Cove*, this still shows that the conversion was not a sham.

subdivision (d), the subdivider need only obtain and submit a survey showing that the conversion is not a sham. Section 66427.5 simply leaves no room for opponents of the conversion to show that a conversion is a sham, *other than* by way of the survey. Presumably that is why it requires that the survey "be conducted in accordance with an agreement between the subdivider and a resident homeowners' association, if any, that is independent of the subdivider . . . ." (Subd. (d)(2).)[17]

The Association purports to concede that the City could not "rely on the Association's petition to deny the Application." Nevertheless, it argues that the City could "consider[]" the petition as "additional evidence" to assist it in "evaluat[ing]" the Owner's survey. We do not rule out the possibility that a local agency could consider other evidence, in addition to the survey itself, in determining whether the survey showed that the conversion was not a sham. The petition, however, was not relevant to this issue. For example, the Association argues that the petition showed that the residents who failed to respond to the survey actually opposed the conversion. However, that was irrelevant to whether the *survey* showed that the conversion was a sham; rather, it was an attempt to prove, with *extrinsic* evidence, that the conversion was, *in fact*, a sham.

We therefore conclude that the City abused its discretion by denying the application based on the results of the survey.

## IV.

## DISAPPROVAL OF THE CONVERSION BASED ON THE JUDGMENT IN THE INCOMPLETENESS ACTION

The City also denied the Owner's application due to lack of evidence that the survey had been conducted in accordance with an agreement with an independent homeowners association, "if any." (Subd. (d)(2).) The trial court ruled that the judgment in the incompleteness action, as a matter of collateral estoppel, precluded the City from denying the application on this ground. Appellants contend that this was error.

The Owner urges us to uphold the trial court's collateral estoppel ruling. Alternatively, however, it argues—as it argued in the trial court—that the City has already deemed the application complete, and thus, under the Permit Streamlining Act (Gov. Code, § 65920 et seq.), it cannot deny it on the ground that it is incomplete.

[17] As we discuss in more detail in part V., *post*, the Association had a chance to participate in designing the survey but blew it.

"A reviewing court will uphold a judgment if it is correct for any reason ' "regardless of the correctness of [its] grounds . . . ." [Citation.] "It is judicial action and not judicial reasoning which is the subject of review . . . ." ' [Citation.]" (*People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1119, fn. 4 [60 Cal.Rptr.2d 277, 929 P.2d 596].)

In our view, the key issue is whether the City violated the Permit Streamlining Act. The whole point of the incompleteness action was to determine whether the Owner's application was complete for purposes of the Permit Streamlining Act. Pursuant to the stipulated judgment, the City deemed the application complete. If this completeness determination precluded the City from denying the application based on lack of evidence that the survey was properly conducted, that alone is sufficient to support the trial court's ruling. To the extent that appellants' arguments regarding collateral estoppel are relevant to this issue, however, we will discuss them in that context.

A. *Forfeiture.**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

B. *The Permit Streamlining Act.*

 Under the Permit Streamlining Act, a public agency must maintain a list of the information that an applicant for a development project[18] must submit. (Gov. Code, § 65940, subd. (a).) The list must "indicate the criteria which the agency will apply in order to determine the completeness of any application submitted to it for a development project." (Gov. Code, § 65941, subd. (a).)

When a public agency receives an application for a development project, it has 30 days to determine whether the application is complete and to notify the applicant of its determination. (Gov. Code, § 65943, subd. (a).) If it fails to do so, the application must be "deemed complete . . . ." (*Ibid.*)

If the agency determines that the application is incomplete, it must "specify those parts of the application which are incomplete and . . . indicate the manner in which they can be made complete . . . ." (Gov. Code, § 65943, subd. (a).) The applicant has a right to appeal a determination that its application is incomplete. (*Id.*, subd. (c).)

---

*See footnote, *ante*, page 1049.

[18] Appellants do not dispute that the proposed conversion was a "development project" subject to the Permit Streamlining Act. (See Gov. Code, §§ 65927, 65928, 65931.)

"After a public agency accepts an application as complete, the agency shall not subsequently request of an applicant any new or additional information which was not specified in the list . . . . The agency may, in the course of processing the application, request the applicant to clarify, amplify, correct, or otherwise supplement the information required for the application." (Gov. Code, § 65944, subd. (a).)

"Failure of an applicant to submit complete or adequate information . . . may constitute grounds for disapproving a development project." (Gov. Code, § 65956, subd. (c).)

It necessarily follows that, once a public agency has accepted an application as complete, it cannot deny the application on the ground that it is incomplete. Appellants do not argue otherwise.

### C. *Application to These Facts.*

Here, the City initially determined that the Owner's application was incomplete, in part because it did not show that there was no homeowners association. Eventually, however, the City determined that the application was, in fact, complete. This barred the City from denying the application based on lack of evidence that there was no homeowners association.

The City argues that, by deeming the application complete, it was not necessarily determining that there was, in fact, no homeowners association. Its determination may simply have meant that the Owner did not have to submit evidence that there was no homeowners association for its application to be complete; however, the Owner would still have to present evidence regarding the existence of a homeowners association later, at the public hearing on the application.

At a minimum, however, the completeness determination meant that the City would not require the Owner to submit any additional information regarding the existence of a homeowners association. As noted, the Permit Streamlining Act provides that "[a]fter a public agency accepts an application as complete, the agency shall not subsequently request of an applicant any new or additional information . . . ." (Gov. Code, § 65944, subd. (a).) Presumably opponents of the conversion could still present evidence at the public hearing that there was, in fact, a homeowners association; then the Owner could, if it chose, present additional evidence at the public hearing that there was *no* homeowners association. We may even assume (without deciding) that the City could then find that there was a homeowners association and could deny the application on that ground. However, that is not what the City did. Rather, it denied the application "due to the absence of

any evidence" that there was no homeowners association. Its previous completeness determination, however, precluded it from doing so.

Significantly, the denial also deprived the Owner of its right to cure under the Permit Streamlining Act. If the City deemed the application incomplete, the Owner was entitled to notice of "the manner in which [the application] can be made complete" (Gov. Code, § 65943, subd. (a)) and an opportunity to supply the missing information. Instead, the City determined that the Owner had not submitted "any" of the necessary evidence without giving it any notice of or any opportunity to cure the supposed defect.[19]

The City argues that it was entitled to ask the Owner to "clarify" or "supplement" information supplied with the application. (Gov. Code, § 65944, subd. (a).) However, it never did. It simply denied the application.

Next, the City argues that the completeness determination should not prevent the public from presenting evidence and argument at the hearing. However, as just discussed, we are not holding that opponents of the conversion could not present evidence or that the City could not consider it; we are merely holding that the City could not deny the application based on *lack* of evidence.

We therefore conclude that the City could not deny the application based on lack of evidence that the survey was properly conducted.

## V.

## FUTILITY

### A. *The Appropriate Appellate Remedy.*

Although the City could not deny the application based on lack of evidence that the survey was properly conducted, it is at least arguable, as we have

---

[19] It must be remembered that the planning commission had already *approved* the application. The city council reconsidered the application only because the Klotzes appealed. According to the Klotzes' notice of appeal, however, they were not challenging the survey; to the contrary, they argued that the City should deny the application because the survey itself showed that a majority of residents were opposed to the conversion. The first time the Klotzes argued that the survey had not been properly conducted was in a letter sent to the City and to the Owner just three days before the appeal hearing.

The Owner therefore complains that it was sandbagged. However, it has failed to show that the grounds for the appeal were limited to those stated in the notice of appeal. (See *Cohan v. City of Thousand Oaks* (1994) 30 Cal.App.4th 547, 556 [35 Cal.Rptr.2d 782] ["[t]here is no statutory requirement that a list of grounds be provided in the notice of appeal from a land use decision"].) It also has not shown that three days' notice of this new issue was unreasonable or insufficient. (See *id.* at p. 557.)

mentioned, that it could deny it based on a finding that the survey was not, in fact, properly conducted. Thus, ordinarily, at this point, we would remand with directions to order the City to reconsider the application.

Remand would not be required if there was (1) *some* evidence that there was *no* homeowners association and (2) *no* evidence that there *was* a homeowners association. In that case, we would hold that the survey was properly conducted as a matter of law. On this record, however, this issue presents difficult and unsettled legal questions. For example, what is a "homeowners' association" within the meaning of section 66427.5? It cannot be like the homeowners association of a condominium—a body created by a set of conditions, covenants, and restrictions, of which all homeowners are automatically members—because it has to exist *before* the mobilehome park is subdivided. How many of the homeowners have to be members? What formalities, if any, are necessary to create it? Moreover, how is the subdivider supposed to determine whether there is a homeowners association? Does it have a duty of inquiry? Is it entitled to insist that the homeowners association produce documentary proof of its existence?

Rather than grapple with these issues, we will assume, without deciding, that the Association was a homeowners association within the meaning of section 66427.5 and that the Owner was aware of its existence when it conducted its survey. Even if so, remand is not required for a separate reason—the Owner demonstrated, as a matter of law, that an attempt to enter into an agreement with the Association would be futile.

B. *Futility.*

█ Section 66427.5 does not expressly address what the subdivider is supposed to do if the homeowners association simply will not agree. Still, "[t]he law never requires impossibilities." (Civ. Code, § 3531.) █ Particularly in light of the Legislature's statement that section 66427.5 "is not intended to allow park residents to block a request to subdivide" (Floor Analysis, *supra*, at p. 5), the statute must be construed to excuse the requirement of an agreement where it is clear that an attempt to reach agreement would be futile.

For three months, from May through July 2009, the Owner tried, in good faith, to enter into an agreement with the Association, but all it got was a good old-fashioned runaround. Nevertheless, Madrid's June 5 letter was, pretty plainly, a refusal to agree to any survey on any terms. Moreover, even though Blandino claimed, in her July 31 e-mail, that she was willing to

discuss the survey, and even though the Owner's counsel e-mailed her the same day, asking for her comments and offering to meet with her, she never responded. As a result, the City could not require the Owner to conduct a survey in accordance with an agreement with the Association; the Owner could rely on the survey it had previously conducted.

The Association characterizes Blandino's July 31 e-mail as "offering to negotiate the terms of the required survey agreement," but only if the Owner would "drop" its "unreasonable demand" for Association documents. This is a smokescreen. We do not necessarily agree that the Owner's request for documents was unreasonable, but, assuming it was, all the Association had to do was refuse to comply with it. The Owner never made its request to negotiate conditional on its request for documents. It was the Association, not the Owner, that linked the two. And this also does not explain why Blandino never responded to the Owner's counsel's July 31 e-mail, in which he offered to meet with her unconditionally.

Finally, the City argues that, regardless of whether the Association stonewalled a second survey, the first survey was not valid because it was not conducted in accordance with an agreement: "The statute requires that the Parkowner obtain an agreement on how the survey will be conducted, *then* conduct the survey and submit it with the conversion application. [Citation.] [The ]owner cannot do it backwards." (Italics & boldface omitted.)

We disagree. The Owner had already conducted a survey, without an agreement, and had submitted the survey results with its application. We see no reason why it could not submit *additional* evidence thereafter to show that an attempt to obtain an agreement would be futile. As we have discussed, while the Permit Streamlining Act prohibited the City from *requiring* the Owner to present additional evidence, it did not prohibit *the Owner* from *voluntarily* presenting additional evidence. Moreover, the Owner was not limited to evidence that it had already presented to the planning commission; it was entitled to introduce new or additional evidence in connection with the city council hearing. (Chino Mun. Code, § 19.01.110.B.2.)

## VI., VII.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante,* page 1049.

## VIII.

## DISPOSITION

The judgment is affirmed. The Owner is awarded costs on appeal against appellants.

Ramirez, P. J., and Hollenhorst, J., concurred.

A petition for a rehearing was denied November 30, 2012, and the petition of defendants and appellants and intervener and appellant for review by the Supreme Court was denied February 13, 2013, S206855. Baxter, J., did not participate therein.