Filed 3/7/13  Monarch Country Mobilehome Owners Assn. v. City of Goleta CA2/6

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.111.5.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| MONARCH COUNTRY MOBILEHOME OWNERS ASSOCIATION,<br><br>               Plaintiff and Respondent,<br><br>v.<br><br>THE CITY OF GOLETA et al.,<br><br>               Defendants and Appellants;<br><br>GOLETA MOBILE HOME PARK, LP<br><br>           Real Party In Interest and Appellant. | 2d Civil No. B231244<br>(Super. Ct. No. 1337356)<br>(Santa Barbara County) |

Goleta Mobile Home Park, LP (Park Owner), is the owner of Rancho Mobilehome Park (Park) in the City of Goleta (City).  The City Council approved Park Owner's application to convert Park from rental units to resident ownership.  Park's homeowners' association, Monarch Country Mobilehome Owners Association (Association), filed a petition for a writ of administrative mandate.  Association sought to overturn the City Council's approval of the project.

Park Owner conducted a survey of resident support for the conversion. The trial court concluded that, contrary to Government Code section 66427.5, the survey had not been conducted in accordance with an agreement between Park Owner

and Association.[1]  The court also concluded that the City Council had failed to consider the results of the survey.  The trial court, therefore, granted Association's petition.

Park Owner and City appeal from the order granting the petition.  Park Owner contends that substantial evidence supports the City Council's implied finding that the survey of resident support was conducted in accordance with an agreement between Park Owner and Association.  City concedes that there is no direct evidence of an agreement but maintains that, under the particular circumstances of this case, it is either implied or the statutory requirement of an agreement is a technicality.  We are not bound by City's concession.  Both Park Owner and City argue that the City Council considered the results of the survey.

We conclude that substantial evidence supports the City Council's implied finding that the survey was conducted in accordance with an agreement between Park Owner and Association.  We further conclude that the City Council was required to consider, and did consider, the results of the survey.  However, its consideration was limited to determining whether the proposed conversion is a "sham transaction," i.e., intended merely to preempt a local rent control ordinance.  Here, the City Council did not reach this issue on advice of the City Attorney.  But this omission is harmless because, as a matter of law, the evidence is insufficient to establish that the proposed conversion is a sham.  Accordingly, we reverse the order granting Association's petition for a writ of administrative mandate.

*Background*

In September 2005 Park Owner's predecessor filed an application with City to convert Park to resident ownership.  Park consists of 150 mobilehome spaces

---

[1]  All statutory references are to the Government Code unless otherwise stated.

2

that are leased to residents who own their own mobilehomes.[2]  The spaces are subject to City's rent-control ordinance.

In April 2006 Park Owner provided City with the results of a second survey of resident support for the conversion.  (An initial survey was conducted in the fall of 2005.)  Park Owner represented to City that a "ballot form was prepared in conjunction with [Association] and was distributed to all residents in the mobilehome park."  But responses were received from only 33 residents.  Nine residents supported the conversion, seventeen opposed it, and seven did not say whether they supported or opposed it.

On February 17, 2009, the City Council conducted a public hearing on the project.  Numerous Park residents spoke in opposition.  During the hearing, the City Attorney informed the City Council:  "The State has specifically limited the City's role in reviewing a conversion application.  The procedure specifically states that the City's only role is to determine whether or not the Applicant has gone through each of the things that is required in the statutes."[3]

At the conclusion of the hearing, the City Council, by unanimous vote, approved the project.  Some council members indicated that they were reluctantly voting for the project because they had no choice in the matter.  Council Member Bennett stated:  "[T]here's a lot of uncertainty out there in this whole mess.  And the

---

[2]  " 'Mobile homes are largely immobile as a practical matter, because the cost of moving one is often a significant fraction of the value of the mobile home itself.  They are generally placed permanently in parks; once in place, only about 1 in every 100 mobile homes is ever moved.  [Citation.]  A mobile home owner typically rents a plot of land, called a "pad," from the owner of a mobile home park.  The park owner provides private roads within the park, common facilities such as washing machines or a swimming pool, and often utilities. The mobile home owner often invests in site-specific improvements such as a driveway, steps, walkways, porches, or landscaping.  When the mobile home owner wishes to move, the mobile home is usually sold in place, and the purchaser continues to rent the pad on which the mobile home is located.' [Citation.]"  (*Galland v. City of Clovis* (2001) 24 Cal.4th 1003, 1009.)

[3] As we explain, this was an erroneous direction and foreclosed a determination on whether the conversion was a "sham."

State really and truly does not give us any alternatives. . . . If there were any alternatives, to take, I would be the first to institute those." "There's nothing more that I can say, nothing more that I can do; but I do, in fact, support you [the opponents of the conversion], and I sympathize with you, and I wish there was . . . more that we, as a City, could do to protect your interests." Council Member Easton said that "the State has put the City in a box." Council Member Connell declared: "I have reluctantly come to the conclusion that what we're doing is the best we can do to protect your interests." "[W]hen I was on the Council before we worked very hard on the rent control issue. It's moved beyond that. State law has moved it beyond that to the condo conversion which we have no ability to deny."[4]

A final public hearing on the project was conducted on March 3, 2009. The City Council again voted to approve the project. That same date, City and Park Owner signed a Development Agreement specifying the standards and conditions for conversion of Park to resident ownership.

*Trial Court's Ruling*

The trial court determined that Park Owner and City had failed to comply with section 66427.5. The court concluded that "[t]here is no evidence in the administrative record to support the Park [O]wner's contention that a second survey [of resident support for the conversion] was done in 2006 *with the agreement* of the homeowner's association." The court further concluded: "City did not perform its duty *to consider* the survey results in its vote to approve the development." "City, on advice of counsel, believed . . . that it had no discretion to question the survey's origins, composition, or results." The court continued: "The survey results are important because they might indicate to the City that the proposed project is a sham. . . . Preventing a sham conversion, one that lacks resident support, is within the realm of the City's duties. In other words, the City is more than a rubber stamp and must concern itself with such details. See Colony Cove Properties LLC *v.* City of Carson

---

[4] These comments, as a matter of law, show that the City Council certainly did "consider" not only the survey, but statements of the opposing residents at the hearing.

4

(2010) 187 Cal.App.4th 1487."  Thus, City "abused its discretion in failing to ascertain that a proper survey had been conducted, depriving it of a meaningful opportunity to consider the result as part of its analysis of the merits of approving the project."

*Section 66427.5: 2002 Amendment and Judicial Construction*

Section 66427.5 "applies to *all* subdivisions 'to be created from the conversion of a rental mobilehome park to resident ownership . . . .' [Citation.]"  (*El Dorado Palm Springs Ltd. v. City of Palm Springs* (2002) 96 Cal.App.4th 1153, 1174 (*El Dorado*).)  It "establishes specific measures to avoid the economic displacement of all nonpurchasing mobilehome park residents through notice, an opportunity to purchase, and measured rent increases." (*Pacific Palisades Bowl Mobile Estates, LLC v. City of Los Angeles* (2012) 55 Cal.4th 783, 806.)  For residents who do not purchase their units, the statute preempts local rent control laws.  "As to nonpurchasing residents who are not lower income households, . . . the monthly rent . . . may increase from the preconversion rent to market levels . . . in equal annual increases over a four-year period." (§ 66427.5, subd. (f)(1).)  "As to nonpurchasing residents who are lower income households, . . . the monthly rent . . . may increase from the preconversion rent by an amount equal to the average monthly increase in rent in the four years immediately preceding the conversion, except that in no event shall the monthly rent be increased by an amount greater than the average monthly percentage increase in the Consumer Price Index for the most recently reported period." (§ 66427.5, subd. (f)(2).)[5]

---

[5]  The Development Agreement between City and Park Owner provides greater rent control protection than the statute.  Nonpurchasing residents who are "moderate income households" are provided the same protection afforded to lower income households under the statute.  As to nonpurchasing residents who are "above moderate income households," the monthly rent may increase from the preconversion rent to market levels in equal annual increases over a seven-year period, instead of the statutory four-year period.  Moreover, "[a]ny monthly rent increases subsequent to the Conversion Date shall be subject to a cap of $800 . . . ."  The statute does not impose a dollar cap on rent increases.

5

Section 66427.5, subdivision (e) provides: "The subdivider shall be subject to a hearing by a legislative body or advisory agency . . . . *The scope of the hearing shall be limited to the issue of compliance with this section*." (Italics added.) At the time of the *El Dorado* decision in 2002 (*El Dorado*, *supra*, 96 Cal.App.4th 1153), present subdivision (e) was included in former subdivision (d). Based on the above italicized language of the statute, the *El Dorado* court held that section 66427.5 "limits the power of the City Council to a determination of whether the subdivider has complied with the provisions of the section . . . ." (*Id.,* at p. 1166.) "Thus, the City lacks authority to investigate or impose additional conditions to prevent sham or fraudulent transactions at the time it approves the tentative or parcel map. Although the lack of such authority may be a legislative oversight, and although it might be desirable for the Legislature to broaden the City's authority, it has not done so." (*Id*., at p. 1165.) In *El Dorado* the City of Palm Springs argued that a sham or fraudulent transaction would occur if the purpose of a conversion were to circumvent local rent control laws and raise rents for nonpurchasing residents. (*Ibid*.)

The *El Dorado* court noted that, although "the statute does not specifically protect against sham or failed transactions in which a single unit is sold, but no others, and the park owner then claims a local rent control ordinance is preempted," the courts "will not apply" the statute to such sham or failed transactions. (*El Dorado*, *supra*, 96 Cal.App.4th at p. 1166, fn. 10.) By way of example, the *El Dorado* court cited this court's opinion in *Donohue v. Santa Paula West Mobile Home Park* (1996) 47 Cal.App.4th 1168. There, we refused to allow a rent increase pursuant to section 66427.5 where residents filed a tentative map to convert a mobilehome park to resident ownership, but the conversion did not occur.

The Legislature responded to *El Dorado* by amending section 66427.5 to add new subdivision (d), which provides: "(1) The subdivider shall obtain a survey of support of residents of the mobilehome park for the proposed conversion. [¶] (2) The survey of support shall be conducted *in accordance with an agreement* between the subdivider and a resident homeowners' association, if any, that is independent of the

6

subdivider or mobilehome park owner.  [¶]  (3) The survey shall be obtained pursuant to a written ballot.  [¶]  (4) The survey shall be conducted so that each occupied mobilehome space has one vote.  [¶]  (5) The results of the survey shall be submitted to the local agency upon the filing of the tentative or parcel map, *to be considered as part of the subdivision map hearing* prescribed by subdivision (e)."  (Italics added.)

In an uncodified section of the amendatory act, the Legislature stated: "It is the intent of the Legislature to address the conversion of a mobilehome park to resident ownership that is not a bona fide resident conversion, as described by the Court of Appeal in [*El Dorado*].  The court in this case concluded that the subdivision map approval process specified in Section 66427.5 of the Government Code may not provide local agencies with the authority to prevent nonbona fide resident conversions. The court explained how a conversion of a mobilehome park to resident ownership could occur without the support of the residents and result in economic displacement. It is, therefore, the intent of the Legislature in enacting this act to ensure that conversions pursuant to Section 66427.5 of the Government Code are bona fide resident conversions."  (Stats. 2002, ch. 1143, § 2.)

After the 2002 amendment, section 66427.5 was considered in *Sequoia Park Associates v. County of Sonoma* (2009) 176 Cal.App.4th 1270 (*Sequoia Park*). The appellate court invalidated an ordinance imposing conditions, i.e., percentage requirements of approval by residents in the survey of resident support, additional to those required by section 66427.5.

In 2010 section 66427.5 was reconsidered in *Colony Cove Properties, LLC v. City of Carson*, *supra*, 187 Cal.App.4th 1487 (*Colony Cove*).  There, the City of Carson enacted an ordinance similar to the one in *Sequoia Park*.  The appellate court held that the ordinance was invalid because it imposed requirements in addition " 'to the exclusive statutory requirements of section 66427.5.' [Citation & fn. omitted.]" (*Id*., at p. 1508, fn. omitted.)

The *Colony Cove* court emphasized the importance of the results of the survey of resident support.  It concluded "that the contents of the survey, as opposed to

7

its mere existence, are relevant to the approval process." (*Colony Cove*, *supra*, 187 Cal.App.4th p. 1505.) "Construing the statute to eliminate the power of local entities and agencies to consider the results of the survey when processing a conversion application would consign the 'to be considered' language of subdivision (d)(5) to surplusage." (*Id*., at pp. 1505-1506.) " 'We must presume that the Legislature intended "every word, phrase and provision . . . in a statute . . . to have meaning and to perform a useful function." ' [Citation.]" (*Id*., at p. 1505.) Thus, "by adding the provisions requiring the subdivider to obtain and submit a survey of resident support, the Legislature expressly expanded the statutory factors to be considered at the subdivision map hearing to include the results of the survey." (*Id*., at p. 1506.)[6]

The next case to consider section 66427.5 is *Goldstone v. County of Santa Cruz* (2012) 207 Cal.App.4th 1038. There, Santa Cruz County denied a conversion application because " '[t]he results of the survey [of resident support], testimony and other evidence submitted by park residents establishes [*sic*] near unanimous opposition' to the conversion." (*Id*., at p. 1045.) The appellate court upheld the denial. It reasoned that "[u]nder section 66427.5, subdivision (d)(5), County was authorized to take the results of the resident survey into account when making its decision." (*Id*., at p. 1041.) The *Goldstone* opinion implies that a local agency may deny a conversion application if the survey of resident support demonstrates overwhelming opposition by park residents. In *Goldstone* the survey showed that 119 residents opposed the conversion, while only 2 supported it.

---

[6] After *Colony Cove* was decided, the Senate failed to pass Senate Bill 444, which would have amended section 66427.5, subdivision (d)(5), to permit a local agency to disapprove a conversion "if it finds that the results of the survey have not demonstrated adequate resident support . . . ." (SB 444 as amended in Sen. on April 26, 2011 (2011-2012 Reg. Sess.) "Unpassed bills have little value as evidence of legislative intent. [Citations.]" (*Provigo Corp. v. Alcoholic Beverage Control Bd.* (1944) 7 Cal.4th 561, 568.) " 'We can rarely determine from the failure of the Legislature to pass a particular bill what the intent of the Legislature is with respect to existing law.' [Citation, fn. omitted.]" (*People v. Mendoza* (2000) 23 Cal.4th 896, 921-922.)

The latest case to consider section 66427.5 is *Chino MHC, LP v. City of Chino* (2012) 210 Cal.App.4th 1049 (*Chino*).  We discuss this case at length below.

*Sufficiency of the Evidence to Show that Survey Was Conducted in Accordance with an Agreement between Park Owner and Association*

The trial court found that Park Owner had not secured Association's agreement for the 2006 second survey.  Park Owner contends that the administrative record contains substantial evidence supporting the existence of such an agreement.  Park Owner's contention has merit.  This is where the trial court exceeded its authority.  It is not the fact finder.  The City Council is the fact finder.

Where, as here, the administrative decision did not involve or substantially affect a fundamental vested right, "the trial court's review is limited to examining the administrative record to determine whether the agency's decision and its findings are supported by substantial evidence in light of the whole record.  [Citation.] [¶]  . . .  [A]n appellate court reviewing a trial court's ruling on administrative mandamus [also] applies a substantial evidence standard.  [Citations.]  . . . '[T]he appellate court's function is identical to that of the trial court.  It reviews the administrative record to determine whether the agency's findings were supported by substantial evidence, resolving all conflicts in the evidence and drawing all [reasonable] inferences in support of them.  [Citations.]' [Citation.]"  (*SP Star Enterprises, Inc. v. City of Los Angeles* (2009) 173 Cal.App.4th 459, 469.)

"[W]e must examine the findings made by the [agency] itself to determine whether they were supported by substantial evidence, rather than limiting ourselves to a review of the findings made by the trial court.  [Citations.]"  (*Desmond v. County of Contra Costa* (1993) 21 Cal.App.4th 330, 335.)  " '[S]ubstantial evidence has been defined in two ways: first, as evidence of " ' "ponderable legal significance . . . reasonable in nature, credible, and of solid value" ' " [citation]; and second, as " 'relevant evidence that a reasonable mind might accept as adequate to support a conclusion' " [citation].' [Citation.]"  (*Ibid*.)

9

The City Council impliedly found that the 2006 second survey had been "conducted in accordance with an agreement" between Park Owner and Association. (§ 66427.5, subd. (d)(2).) In the Development Agreement between City and Park Owner, City "acknowledges that . . . [Park] Owner has submitted the results of a survey of support pursuant to the provisions of Government Code Section 66427.5(d)." On the same date that the City Council approved the conversion, it adopted the Development Agreement.

We review the administrative record to determine whether the City Council's implied finding is supported by substantial evidence. In a letter dated September 30, 2005, City informed Park Owner that its application was incomplete because, among other things, the application did not include a survey of resident support for the conversion "conducted in accordance with an agreement between" Park Owner and Association. In response to the letter, Park Owner conducted an initial survey in the fall of 2005. Park Owner conceded in the trial court that the "initial survey . . . was done without the agreement of [Association]." After conferring with Association, Park Owner conducted a second survey in 2006.

The trial court granted Park Owner's motion to augment the administrative record to include a January 19, 2006 email from Dennis Shelly, the Association's president, to Park Owner. Shelly requested that the second survey ask "a series of [five] questions that would serve to make [it] complete and meaningful." The first two questions were included in the second survey. The gist of the third and fourth questions were also included.[7] The fifth question was not included. It would have

---

[7] The third and fourth questions proposed by Shelly would have allowed a resident to put a check mark next to each of the following two sentences: (1) "I do NOT have enough information about the cost of converting to a subdivision." (2) "Based on the information I have, I do NOT believe I will be able to afford to live here if the park is subdivided." Instead of these questions, the second survey allowed a resident to put a check mark next to each of the following three sentences: (1) "I do not have enough information about the cost of ownership of a subdivision lot to make a purchase decision at this time." (2) "Based on the information I currently have, I am concerned that I may not be able to afford to purchase my lot after subdivision." (3) "Based on

10

allowed a resident to put a check mark before the following sentence: "I would like to have more information about other options."

The email was not part of the original administrative record. "'The general rule is that a hearing on a writ of administrative mandamus is conducted solely on the record of the proceeding before the administrative agency. [Citation.]' [Citation.] Augmentation of the administrative record is permitted only within the strict limits set forth in [Code of Civil Procedure] section 1094.5, subdivision (e) which provides as follows: 'Where the court finds that there is relevant evidence which, in the exercise of reasonable diligence, could not have been produced or which was improperly excluded at the hearing before respondent, it may enter judgment as provided in subdivision (f) remanding the case to be reconsidered in the light of that evidence;[8] or, in cases in which the court is authorized by law to exercise its independent judgment on the evidence, the court may admit the evidence at the hearing on the writ without remanding the case.' [Citations.]" (*Pomona Valley Hospital Medical Center v. Superior Court* (1997) 55 Cal.App.4th 93, 101.) Here, the trial court was not " 'authorized by law to exercise its independent judgment on the evidence.' " (*Ibid*.) Thus, the trial court erred in augmenting the administrative record

---

the information I currently have, I am concerned that I may not be able to afford to continue to rent my space after subdivision."

[8] Code of Civil Procedure section 1094.5, subdivision (f) provides: "The court shall enter judgment either commanding respondent to set aside the order or decision, or denying the writ. Where the judgment commands that the order or decision be set aside, it may order the reconsideration of the case in light of the court's opinion and judgment and may order respondent to take such further action as is specially enjoined upon it by law, but the judgment shall not limit or control in any way the discretion legally vested in the respondent."

to include the email without remanding the matter to the City Council for reconsideration in light of the new evidence.[9]

The court's error, however, was invited by the Association. In open court, counsel conceded that the court could grant the motion to augment the administrative record to include the email and, in addition, could consider the new evidence: "We've responded [to the motion to augment] . . . by basically conceding the Court can put it [the email] as part of its record and consider it and give it the weight that it deems appropriate." "If a party induces the commission of an error, 'he is estopped from asserting it as grounds for reversal. [Citations.]' [Citation.] 'At bottom, the doctrine rests on the purpose of [a] principle, which is to prevent a party from misleading the trial court and then profiting therefrom in the appellate court. [Citations.]' [Citation.]" (*Mundy v. Lenc* (2012) 203 Cal.App.4th 1401, 1406.)

We recognize that, after conceding that the trial court could grant the motion to augment, Association's counsel "suggest[ed]" that the trial court could not rely upon the email "in reviewing the sufficiency of the city's action" because the email "was not in the city's record when they acted on this thing." Counsel was contradicting himself. If a party concedes that the administrative record may be augmented to include an item of evidence and the record is so augmented, the party will not be heard to complain that the evidence cannot be relied upon because it is not properly part of the administrative record.

---

[9] See California Administrative Mandamus (Con't.Ed.Bar. 3d ed. 2003) section 4.12d, Feb. 2012 Update, pp. 127-128: "If the court decides that the record should be augmented with material not submitted during the administrative proceedings . . . , and that the independent judgment test applies . . . , the court can either admit the evidence at the hearing or remand the case to the agency to hear the evidence and reconsider its decision or order in light of that evidence. CCP § 1094.5(e). . . . If the substantial evidence test applies . . . , the court may not admit the additional evidence and is limited to remanding the case to the agency for reconsideration in the light of that evidence. CCP § 1094.5(e)."

12

In view of the augmentation of the administrative record to include the email, substantial evidence supports the City Council's implied finding that the 2006 second survey was conducted in accordance with an agreement between Park Owner and Association. The agreement is manifested by the parties' conduct. (See Civ. Code, § 1621 ["An implied contract is one, the existence and terms of which are manifested by conduct"].) Shelly requested that the second survey be modified to include specific provisions, and Park Owner modified it to include all but one of these provisions. The omitted provision - an expression of a desire for information about other options - was inappropriate because it was not pertinent to whether Park residents supported the conversion.

Even without the email, substantial evidence supports the implied finding of an agreement for the 2006 second survey. In a letter to City dated April 5, 2006, Park Owner's counsel, Hart, King & Coldren, enclosed the results of the second survey. Counsel stated that the survey "form was prepared in conjunction with the Home Owner Association." In an attachment to a letter dated November 3, 2006 from Dennis Shelly to City, Shelly's only objection to the second survey was that Association had not yet received a copy of the survey results. Shelly noted that, prior to the second survey, Park owner had "conferred" with Association. Shelly stated: "The [2005] initial survey received almost no response – in part because [Park Owner] failed to confer with [Association]; and in part because [Association] then asked residents to NOT respond. Then, after conferring with [Association], a [2006] second survey was distributed. We were told that we would receive a copy of the results of that survey, but to-date, we have NOT." Unlike the 2005 initial survey, Shelly did not say that Association had requested residents to not respond to the 2006 second survey. The absence of such a request is supported by the fact that 33 residents responded to the second survey, while the initial survey "received almost no response."

*City's Consideration of Survey of Resident Support*

We now must determine whether the City Council properly considered the results of the survey. This requires us to interpret the 2002 amendment that added

13

new subdivision (d) to section 66427.5. "Under settled canons of statutory construction, in construing a statute we ascertain the Legislature's intent in order to effectuate the law's purpose. [Citation.] We must look to the statute's words and give them their usual and ordinary meaning. [Citation.] The statute's plain meaning controls the court's interpretation unless its words are ambiguous." (*Green v. State* (2007) 42 Cal.4th 254, 260.)

The statutory language requires a local agency to consider the results of the survey, but it provides no guidance on the permissible scope of this consideration. "Because of this ambiguity, '[i]t is appropriate to consider evidence of the intent of the enacting body in addition to the words of the measure, and to examine the history and background of the provision, in an attempt to ascertain the most reasonable interpretation.' [Citation.] We may also consider extrinsic aids such as the ostensible objects to be achieved, the evils to be remedied, and public policy. [Citation.]" (*People v. Manzo* (2012) 53 Cal.4th 880, 886.)

We look for guidance to the Legislature's expression of intent in the uncodified section of the 2002 act amending section 66427.5. (Stats. 2002, ch. 1143, § 2.) "Although . . . statements in an uncodified section do not confer power, determine rights, or enlarge the scope of a measure, they properly may be utilized as an aid in construing a statute. [Citation.]" (*People v. Canty* (2004) 32 Cal.4th 1266, 1280.)

In the uncodified section, the Legislature stated: "It is the intent of the Legislature to address the conversion of a mobilehome park to resident ownership that is not a bona fide resident conversion, as described by the Court of Appeal in [*El Dorado*, *supra*, 96 Cal.App.4th 1153]. . . . [T]he intent of the Legislature in enacting this act [is] to ensure that conversions pursuant to Section 66427.5 of the Government Code are bona fide resident conversions." (Stats. 2002, ch. 1143, § 2.) The non-bona fide conversion described by the *El Dorado* court was a conversion "by a developer who was engaged in a sham or fraudulent transaction which was intended to avoid the rent control ordinance." (*El Dorado*, *supra*, at p. 1165.) The court pointed out that

14

"the statute does not specifically protect against sham or failed transactions in which a single unit is sold, but no others, and the park owner then claims a local rent control ordinance is preempted by section 66427.5, subdivision (d) [now (f)]." (*Id.*, at p. 1166, fn. 10.) The *El Dorado* court did not deem a conversion to be non-bona fide if it lacked resident support. The court observed that "[t]he legislative intent to encourage conversion of mobilehome parks to resident ownership would not be served by a requirement that a conversion could only be made with resident consent."[10] (*Id.*, at p. 1182.)

The Assembly Floor Analysis of the final version of the 2002 amendment is consistent with the Legislature's expression of intent in the uncodified section. (Conc. in Sen. Amends. to Assem. Bill No. 930 (2001-2002 Reg. Sess.), Aug. 30, 2002 (Assembly Floor Analysis).) The analysis shows that the Legislature intended to empower local agencies to prevent sham or fraudulent transactions designed to evade a local rent control ordinance. A floor analysis of a bill may be considered in determining legislative intent. (*People v. Broussard* (1993) 5 Cal.4th 1067, 1075 [Senate Floor Analysis "demonstrates that the Legislature intended" that the bill "correct [an] anomaly in the statutory scheme"].)

The Assembly Floor Analysis notes that in *El Dorado*, *supra*, 96 Cal.App.4th at p. 1165, the court stated: " 'We are equally concerned about the use of the section [66247.5] to avoid local rent control,' but 'the City lacks authority to investigate or impose additional conditions to prevent sham or fraudulent transactions.'

---

[10] The legislative intent to encourage conversions was noted by the *Sequoia Park* court: "For 25 years, the state has had the policy 'to encourage and facilitate the conversion of mobilehome parks to resident ownership.' (Health & Saf. Code, § 50780, subd. (b).) The state is even willing to use public dollars to promote this policy. (Health & Saf. Code, § 50782 [establishing the Mobilehome Park Purchase Fund].)" (*Sequoia Park*, *supra*, 176 Cal.App.4th at p. 1298; see also *Pacific Palisades Bowl Mobile Estates, LLC v. City of Los Angeles*, *supra*, __Cal. 4th __, 149 Cal.Rptr.3d at p. 397 ["the MPROP [Mobilehome Park Resident Ownership Program] reflects a state policy favoring conversions of mobilehome parks to resident ownership"].)

"  (Assembly Floor Analysis, p. 3.)  The analysis continues: "The [*El Dorado*] court went on to rule that [section] 66427.5 takes effect as soon as one unit is sold and supersedes a local rent control ordinance.  [¶]  As a result of [this] . . . court ruling[], the proponents of this bill are seeking to address what they feel could potentially become a way for park owners to get around local rent control ordinances.  As evidence of these concerns, the supporters have submitted a newsletter from a law firm that encourages park owners seeking an 'exit strategy' from mobilehome park ownership to consider selling their park on a space by space basis through conversion to resident ownership.  The newsletter continues that, 'This decision [*El Dorado*] offers mobilehome park owners a new and more viable option to escape the draconian revenue limits imposed by rent control.' "  (*Id*., at pp. 3-4.)

The Assembly Floor Analysis goes on to state:  "This bill seeks to ensure that the conversion is not a sham conversion by requiring a vote of the residents to be submitted to the local agency.  Essentially, the bill is addressing a statement by the court in *El Dorado* that 'the courts will not apply section 66427.5 to sham or failed transactions, or to avoid a local rental control ordinance.'  Making this determination would not be easy for a local agency that did not proactively seek to inquire with the residents on their position.  [¶]  This bill seeks to provide a measure of that support for local agencies to determine whether the conversion is truly intended for resident ownership, or if it is an attempt to preempt a local rental control ordinance." (Assembly Floor Analysis, pp. 4-5.)

The Assembly Floor Analysis emphasizes that a conversion is not a sham merely because it lacks majority support: "*The fact that a majority of the residents do not support the conversion is not . . . an appropriate means for determining the legitimacy of a conversion.  The law is not intended to allow park residents to block a request to subdivide.  Instead, the law is intended to provide some measure of fiscal protection to nonpurchasing residents.*"  (Assembly Floor Analysis, p. 5, italics added.)

16

Both the uncodified section of the act and the Assembly Floor Analysis, speak to a "bona fide resident conversion." This occurs when the subdivider truly intends that the spaces in the mobilehome park be converted to resident ownership. A "sham transaction" occurs when the subdivider's purpose in seeking conversion is merely "an attempt to preempt a local rent control ordinance." (Assembly Floor Analysis, p. 5; see *Chino*, *supra*, 210 Cal.App.4th at p. 1069 ["[A] sham conversion is one that is *merely* intended to avoid rent control and *not* to transfer ownership to residents"].) The Assembly Floor Analysis shows that the Legislature intended that a local agency should consider the results of a survey of resident support in determining whether the conversion is a "bona fide resident conversion" or a "sham transaction." If the local agency concludes that the conversion is a "sham transaction," it has the authority to not approve the conversion.

"It is foreseeable that the results of this survey could be used to argue to a court that the conversion is a sham and that the rent formulas in Section 66427.5 should not be applied." (Assembly Floor Analysis, p. 5) That such an argument could be made to a court does not preclude a similar argument from being made to a local agency when it performs its statutory duty to "consider" the results of the survey. (§ 66427.5, subd. (d)(5).) The Legislature wanted to prevent the approval of sham conversions by local agencies. This protects mobilehome park residents against rent increases resulting from sham conversions and relieves them of the burden of suing to enjoin the increases.

The administrative record indicates that the City Council did not consider whether Park Owner's proposed conversion is a sham transaction designed to circumvent City's rent control ordinance. The City Attorney erroneously advised the City Council that its "only role is to determine whether or not the Applicant has gone through each of the things that is required in the statutes." (See *ante,* p. 3.)

Because the City Attorney did not advise the City Council that it could, as the finder of fact, determine that the conversion was a "sham," i.e., intended merely to preempt City's rent control ordinance, it may not be appropriate to imply a finding

17

that the conversion was not a "sham" based on the City Council's approval of the project. We would only order remand to the City Council if there were some showing of sham. Pursuant to *Chino*, *supra*, 210 Cal.App.4th 1049, the City Council would abuse its discretion if, on remand, it determined that the conversion was a sham.

In *Chino* the mobilehome park had 260 residents. Only 36 residents (14 percent) returned the survey, and 33 residents (13 percent) responded to the questions asked in the survey. Of these 33 respondents, 14 (42 percent) supported the conversion, and 19 (58 percent) opposed it. The *Chino* court decided that, based on these results, the local agency had abused its discretion in denying the application for conversion to resident ownership. (*Id*., at pp. 1074-1075.) The court reasoned: "For purposes of this case . . . it suffices to hold that a majority of 58 to 42 percent is precisely the kind of bare majority that the Legislature did not intend to be able to block a conversion." (*Id*., at p. 1074, fn. omitted.) The *Chino* court concluded that, even if only 10 residents had supported the conversion and 23 had opposed it, the "level of support would be 30 percent," which would "still show[] the conversion was not a sham." (*Id*., at p. 1074, fn. 16.) The court declared: "[A]ll the survey showed was that the majority of residents did not care enough to return the survey . . . . This is affirmative evidence that the conversion was *not* a sham." (*Id*., at p. 1074.) The court distinguished the facts before it from those in *Goldstone v. County of Santa Cruz*, *supra*, 207 Cal.App.4th 1038, where the survey results "showed that residents opposed the conversion by 119 to 2, out of a proposed potential total of 147." (*Id*., at pp. 1073-1074.) The court considered *Goldstone* to "be almost the paradigm case of a sham conversion." (*Id*., at p. 1074.)

The *Chino* court concluded that the survey was the only means available to prove that the survey was a sham: "[U]nder subdivision (e) [of section 66427.5], a local agency can consider only 'compliance with this section,' and under subdivision (d), the subdivider need only obtain and submit a survey showing that the conversion is not a sham. Section 66427.5 simply leaves no room for opponents of the conversion to show that a conversion is a sham, *other than* by way of the survey."

18

(*Id*., at pp. 1074-1075.) The court interpreted the statute as proscribing "an attempt to prove, with *extrinsic* evidence [i.e., evidence other than the survey results], that the conversion was, *in fact*, a sham."[11] (*Id*., at p. 1075.) Thus, in determining whether the conversion was a sham, the Chino City Council was precluded from considering a petition opposing the conversion that was signed by residents of 230 of the 260 lots. The petition could not serve as a substitute for the survey, and it "was irrelevant to whether the *survey* showed that the conversion was a sham." (*Ibid*.)

Here, the mobilehome park had 150 residents. Only 33 residents (22 percent) returned the survey, and 26 residents (17 percent) responded to the questions asked in the survey. Of these 26 respondents, 17 (65 percent) opposed the conversion and 9 (35 percent) supported it.[12] Pursuant to *Chino*, a majority of 65 to 35 percent was insufficient to show that the conversion was a sham. Moreover, 78 percent of the residents "did not care enough to return the survey," which was "affirmative evidence

_____

[11] On the other hand, the *Chino* court did "not rule out the possibility that a local agency could consider other evidence, in addition to the survey itself, in determining whether the *survey* showed the conversion was not a sham." (*Chino*, *supra*, 210 Cal.App.4th at p. 1075, italics added.)

[12] In a supplemental letter brief filed after oral argument, Association contends for the first time that the administrative record "does not . . . clearly support the claim that 9 residents supported the conversion." Association also contends that 19, not 17 residents, opposed the conversion. These contentions come too late. In their opening briefs, both Park Owner and City asserted that 9 residents supported the conversion and 17 opposed it. In a footnote, Park Owner wrote that the trial court had "mistakenly stated [in its statement of decision] that 'only six supported the conversion.' " In respondent's brief, Association did not contest Park Owner's and City's account of the survey results. Accordingly, Association has forfeited its contention that their account is not supported by the administrative record. (See *San Mateo County Coastal Landowners' Assn. v. County of San Mateo* (1995) 38 Cal.App.4th 523, 559, fn. 28 [new issue raised by appellant in a letter brief forfeited because it was not raised in opening or closing brief].)

19

that the conversion was *not* a sham." (*Chino*, *supra*, 210 Cal.App.4th at p. 1074.) In addition, the approval rating here (9 out of 150 residents, or 6 percent) was almost identical to the approval rating in *Chino* (14 out of 260 residents, or 5.4 percent). Since the local agency in *Chino* abused its discretion in denying the conversion application, it follows that City would abuse its discretion if, on remand, it denied Park Owner's conversion application.

Accordingly, a remand to the City Council is unwarranted even though it failed to consider the sham transaction issue. Its failure to do so was harmless error. As a matter of law, the evidence in the administrative record is insufficient to establish a sham transaction.

*Disposition*

The judgment (order granting petition for a writ of administrative mandate) is reversed. The matter is remanded to the trial court with directions to deny the petition. Park Owner and City shall recover their costs on appeal.

NOT TO BE PUBLISHED.

YEGAN, J.

We concur:

GILBERT, P.J.

PERREN, J.

20

Denise De Bellefeuille, Judge

Superior Court County of Santa Barbara

_____

Tim W. Giles, City Attorney, for Defendant and Appellant City of Goleta.

Gilchrist & Rutter, Richard H. Close, Thomas W. Casparian and Yen N. Hope for Real Party in Interest and Appellant Goleta Mobile Home Park.

Aleshire & Wynder, William W. Wynder, Sunny K. Soltani, Jeff M. Malawy and Lindsay Tabaian for the League of California Cities as Amicus Curiae on behalf of Defendant and Appellant City of Goleta.

James P. Ballantine for Plaintiff and Respondent Monarch Country Mobilehome Owners Association.

Law Office of William J. Constantine and William J. Constantine for the Bay Federal Credit Union as Amicus Curiae on behalf of Monarch Country Mobilehome Owners Association.